[Civ. No 997.    Fifth Dist.    Oct. 25, 1968.]

KARL PETERSON, Petitioner, v. WORKMEN'S COMPEN-
SATION APPEALS BOARD, HANSEN'S SHEET
METAL et al., Respondents.

Cardozo, Trimbur & Nickerson and John M. Trimbur for Petitioner.

Everett A. Corten, Selma Mikels, Hanna & Brophy and Donald V. Mitchell for Respondents.

CONLEY, P. J.—While petitioner, Karl Peterson, injured in an industrial accident on August 19, 1964, won his case before the Workmen's Compensation Appeals Board, he is prosecuting this appeal because he believes that he was not awarded enough; the award was based on a determination that only 50 percent of his disability was caused by the industrial accident, whereas he argues that he should have been awarded damages for 100 percent disability.

During the course of his employment by Hansen's Sheet Metal, part of a door in the premises of the Campbell Soup

Company became unhinged and fell upon the petitioner, causing a cerebral concussion. However, Mr. Peterson, off and on, had been under treatment for several years, including two craniotomies, which were effected during a long history of medical complaints, and the referee and, in turn, the Workmen's Compensation Appeals Board determined that 50 percent of his disability was due to his industrial accident and 50 percent to his bodily condition entirely apart from the industrial accident.

There is no question but that Mr. Peterson is wholly disabled from remunerative work. The only question is whether his total incapacity is partially due to his pathological bodily condition entirely apart from the industrial accident. Generally speaking, if such is the case as shown by substantial evidence in the record, even if there is also contrary evidence, this court is powerless to interfere with the finding and conclusion of the Workmen's Compensation Appeals Board.

The legal principles to be applied are clear. ▉ Where an industrial injury activates or "lights up" a dormant (asymptomatic) preexisting nondisabling condition or disease, and the resulting disability is due solely to the activating effect of an injury, then, the employer is liable for that disability and there can be no apportionment. (*Berry* v. *Workmen's Comp. App. Bd.*, 68 Cal.2d 786, 789 [69 Cal.Rptr. 68, 441 P.2d 908]; *Zemke* v. *Workmen's Comp. App. Bd.*, 68 Cal. 2d 794, 796 [69 Cal.Rptr. 88, 441 P.2d 928]; *Reynolds Elec. etc. Co.* v. *Workmen's Comp. App. Bd.*, 65 Cal.2d 438, 442-443 [55 Cal.Rptr. 254, 421 P.2d 102]; *Colonial Ins. Co.* v. *Industrial Acc. Com.*, 29 Cal.2d 79, 83-84 [172 P.2d 884]; *Tanenbaum* v. *Industrial Acc. Com.*, 4 Cal.2d 615 [52 P.2d 215].)

Similarly, where the injury accelerates or aggravates a preexisting active (symptomatic), but nondisabling condition, so that such acceleration or aggravation causes it to become disabling, then, the employer is liable for the full disability without proration. (*Berry* v. *Workmen's Comp. App. Bd.*, *supra*, 68 Cal.2d 786, 793; *Colonial Ins. Co.* v. *Industrial Acc. Com.*, *supra*, 29 Cal.2d 79, 83-84; *Tanenbaum* v. *Industrial Acc. Com.*, *supra*, 4 Cal.2d 615.)

As stated in *Tanenbaum* v. *Industrial Acc. Com.*, *supra*, 4 Cal.2d 61, at page 617: "The underlying theory is that the employer takes the employee subject to his condition when he enters the employment, and that therefore compensation is not to be denied merely because the workman's physical condition was such as to cause him to suffer a disability from an injury

which ordinarily, given a stronger and healthier constitution, would have caused little or no inconvenience. In such cases full compensation for the entire disability suffered is recoverable although the physical condition of the employee contributed to and increased the disability caused by the injury. . . .''

This rule is also articulated in *Liberty Mut. Ins. Co.* v. *Industrial Acc. Com.*, 73 Cal.App.2d 555, 559 [166 P.2d 908] : ''Industry takes the employee as it finds him. A person suffering from a preexisting disease who is disabled by an injury proximately arising out of the employment is entitled to compensation even though a normal man would not have been adversely affected by the event.''

On the other hand, where part of the disability is attributable to the natural progression or ''normal progress'' of a preexisting condition or disease which would have occurred regardless of the industrial injury the disability must be apportioned. (*Zemke* v. *Workmen's Comp. App. Bd., supra,* 68 Cal.2d 794, 796; *Reynolds Elec. etc. Co.* v. *Workmen's Comp. App. Bd., supra,* 65 Cal.2d 438, 443; *Tanenbaum* v. *Industrial Acc. Com., supra,* 4 Cal.2d 615.)

Thus, while the employer is liable for that portion of the total disability caused by the industrial injury, he is not liable for the part of the disability which ''. . . would have resulted, in the absence of the industrial injury, from the 'normal progress' of the pre-existing disease.'' (*Zemke* v. *Workmen's Comp. App. Bd., supra,* 68 Cal.2d 794, 796.)

It is a question of fact for the Workmen's Compensation Appeals Board to decide in a given case whether the disability is apportionable because it results in part from the normal progress of a preexisting condition or represents a fully compensable ''lighting up'' or aggravation of a preexisting condition or disease. (*Berry* v. *Workmen's Comp. App. Bd., supra,* 68 Cal.2d 786, 789; *Zemke* v. *Workmen's Comp. App. Bd., supra,* 68 Cal.2d 794, 796; *Fred Gledhill Chevrolet* v. *Industrial Acc Com.,* 62 Cal.2d 59, 61 [41 Cal. Rptr. 170, 396 P.2d 586]; *Argonaut Ins. Co.* v. *Industrial Acc. Com.,* 57 Cal.2d 589, 593 [21 Cal.Rptr. 545, 371 P.2d 281].)

Did the industrial injury in the instant case serve to ''light up'' or aggravate a condition or disease that would not have become disabling but for the injury, or is the present disability due, in part, to the natural progression of a preexisting condition, which would have become disabling had the injury not occurred?

After the taking of evidence at the hearing, the referee made findings of fact that:

". . . 3) The injury caused temporary total disability beginning August 20, 1965 to and including February 19, 1965. . . .

"4) The injury caused permanent disability of 50 percent after apportionment . . . ,"

and wrote an opinion in which he stated that 50 percent of Mr. Peterson's disability is due to the industrial injury and that 50 percent thereof is attributable to the natural progression of his preexisting pathological condition. (See Lab. Code, § 4663; *Tanenbaum* v. *Industrial Acc. Com., supra,* 4 Cal.2d 615.) ▮ On review ". . . even if the findings [of the Workmen's Compensation Appeals Board] are inadequate for uncertainty they will be upheld if they can be made certain by reference to the record." (*Rogers Material Co.* v. *Industrial Acc. Com.,* 63 Cal.2d 717, 721 [48 Cal.Rptr. 129, 408 P.2d 737], quoted in *Jones* v. *Workmen's Comp. App. Bd.,* 68 Cal.2d 476, 478-479 [67 Cal.Rptr. 544, 439 P.2d 648].) Therefore, if the evidence in the record will support the application of a rule of law requiring apportionment in this case, then the findings of the board should be upheld even if they are uncertain.

In reviewing the evidence, the standards to be applied by this court are well settled. ▮ While the Workmen's Compensation laws are to be liberally construed (Lab. Code, § 3203; *Shell Oil Co.* v. *Industrial Acc. Com.,* 199 Cal.App.2d 426, 431 [18 Cal.Rptr. 540]), nevertheless, on review a factual determination by the board will not be annulled unless unsupported by substantial evidence (*Argonaut Ins. Co.* v. *Industrial Acc. Com., supra,* 57 Cal.2d 589, 593; *Douglas Aircraft, Inc.* v. *Industrial Acc. Com.,* 47 Cal.2d 903, 905 [306 P.2d 425]; Lab. Code, § 5952).

Conflicts in the evidence must be resolved in favor of the findings of the board, and these findings will not be disturbed on appeal if there exists any evidence in their support. (*Jones* v. *Workmen's Comp. App. Bd., supra,* 68 Cal.2d 476, 478-479; *Rogers Materials Co.* v. *Industrial Acc. Comp., supra,* 64 Cal.2d 717, 721.)

On August 19, 1964, the petitioner was injured when one section of a large swinging door consisting principally of half-inch rubber came loose and struck him on the head, causing a cerebral concussion. This injury occurred less than three months after petitioner had undergone an exploratory crani-

otomy, on May 29, 1964. The exploratory surgery culminated a long history of medical complaints.

The first known incident involving a cranial problem occurred while petitioner was in the service in 1945. This may have involved a skull fracture; the concussion was apparently severe; however, little information concerning it is available. Whether this early injury is related to petitioner's present problem is not resolved.

On October 23, 1957, the petitioner complained of suffering from headaches. He was referred to Dr. Tom Huff, a neurosurgeon in Stockton, by Dr. William Broderick of Modesto for an evaluation of the complaint of headaches. On June 22, 1962, petitioner was again referred to Dr. Huff, this time by Dr. Harris Wilson of Modesto. At that time, Dr. Huff obtained a history of complaints of pain in the back of the head on the right side, off and on for over a year but persistent for the last three or four months.

In August of 1963, petitioner awoke in the morning and experienced a sudden episode of unconsciousness and numbness and weakness on the left side of the body. This has been referred to as a ''stroke,'' by petitioner, but, in the opinion of at least one of the examining physicians, it is doubtful whether this was a true stroke. There was difficulty in sensation and in motor power involving the left side, including the face, arm and leg. The weakness and numbness disappeared in approximately one month, and he returned to work in September of 1963.

In approximately November or December of 1963, the petitioner developed headaches in the right temporal region, which he described as sharp and pressure-like. Since these headaches did not improve, he was referred to Dr. D. E. Lamond, a neurosurgeon, who by this time was the associate and colleague of Dr. Huff, who had previously examined petitioner.

During this same period of time, the petitioner developed severe left chest pains, which he thought were due to spasms of the heart, and, just prior to Dr. Lamond's consultation on the file, the patient had an episode of acute chest pain, was said to walk in a confused manner, was unaware of his surroundings, and complained of severe headaches, numbness of the left hand and other symptoms. On the basis of all these problems, he was hospitalized on February 10, 1964, under the care of Dr. Lamond, who in turn called in a Dr. Caul, an internist, due to the complaint of chest pain. Dr. Caul found

that the electrocardiograms were normal and that the pains emanated from the chest wall, rather than the heart. Both Dr. Caul and Dr. Lamond commented on increased stresses of a personal nature at home, and they concluded that the history and studies suggested a psychophysiologic (hysterical) problem. The petitioner was discharged from the hospital after the various tests and a reasonable convalescence. Within about two months of his discharge from the hospital, he had another episode consisting of sudden unprovoked unconsciousness without convulsive movement and without injury causing same. Subsequent to this unconscious episode, he had intermittent episodes of numbness and weakness in the left arm and leg. He was, therefore, referred again to Dr. Lamond, who rehospitalized the applicant in May of 1964. Further testing was performed, including an arteriogram, which was interpreted by the radiologist as suggesting a right temporal lobe abnormality, which was compatible with the clinical history.

On May 29, 1964, the exploratory craniotomy was performed. The findings on surgery showed an abnormal collection of fluid and a swollen temporal lobe, but nothing by way of a tumor. The fluid was drained. The only real objective factor of importance to the doctor was the finding of abnormal venous pathways that ran down to the base of the temporal lobe. Biopsies indicated abnormal cells without any specific tumor being present. The doctor concluded that possibly there was abnormal circulation through these unusual venous pathways, causing temporary changes in circulation through the temporal lobe, and, as a consequence of this, episodes of numbness and weakness involved in the left arm and leg, though he was not sure whether this could be a cause of the headaches.

After convalescence, the patient was discharged from the hospital and appeared to be improving. In a post-operative visit to Dr. Lamond on July 29, 1964, he stated that he was feeling better than he had for many years. He denied having headaches and stated that he was full of energy and good spirits and was anxious to return to work. Dr. Lamond felt that there was no real explanation for his improvement as the doctor did not feel that the exploratory surgery actually accomplished any particular factor that would bring about a change in the condition one way or the other, although on cross-examination he did indicate that mere exploratory surgery with the draining of fluid will occasionally cause head-

aches to cease. But he said that there is no real explanation
for this phenomenon.

Petitioner returned to work on August 1, 1964. He per-
formed supervisory work and was not involved in any physical
stress or strain. As far as can be determined, he appeared to
be convalescing in a reasonable manner. Several fellow
workers testified that he seemed normal, and he did not com-
plain of headaches. His wife also said that he was free from
complaints during the period between the craniotomy and the
industrial accident. On August 19, 1964, he sustained the
industrial injury when he was struck on the right side of the
head by a falling rubber door. He was admitted to Doctors'
Hospital in Modesto on the date of the injury. During his
stay in Doctors' Hospital in Modesto, the petitioner ". . .
had another one of these spells, similar presumably to the ones
he had earlier [unconsciousness]." Subsequent to this, the
petitioner was transferred to the St. Joseph's Hospital in
Stockton under the care of Drs. Huff and Lamond. The physi-
cians found no evidence of disturbance to the craniotomy bone
flap, and during his hospital stay he showed continuing
improvement, and was discharged on September 8. At this
time, he still had complaints of dizziness and occasional head-
aches.

Petitioner returned to work on October 19, 1964, once again
in a supervisory capacity. He was being seen as an out-patient
by Dr. Lamond, who felt he was making satisfactory progress.
When examined by Dr. Lamond on October 26, 1964, he had
been working four days. He had general muscle aches, felt he
was out of shape, and had some spontaneous headaches which
he felt were mild. The doctor was encouraged and thought
that he was making satisfactory progress. However, then, the
headaches seemed to become more severe and he finally quit
work on November 5, 1964. On November 9, 1964, petitioner
again saw Dr. Lamond. He had had another of his uncon-
scious spells. The doctor felt that he should be readmitted to
the hospital for further evaluation. He was admitted on
November 25, 1964. An EEG was performed showing some
minor focal changes in the right temporal area and a new
arteriogram was obtained, which again indicated evidence of a
mass in the temporal area. A second craniotomy was per-
formed on December 4, 1964, at which time a small brain
abscess was found and removed. Dr. Lamond gave his opinion
that this abscess was the result of a reaction to foreign mate-
rials which came in contact with the brain during the first

craniotomy, and that it was unrelated to the industrial injury.

During January of 1965, following the second craniotomy, Dr. Lamond, upon examining petitioner, noted that he was generally weak, but improved. Dr. Lamond found that petitioner had increasing tension, which he felt was caused by family problems. Petitioner at that time complained again of left chest pain and stated that he had had several episodes of weakness in the left arm. During February and March of 1965, these symptoms continued. When examined on May 12, petitioner seemed to be extremely depressed and psychiatric consultation was discussed with the patient and his wife.

When seen on November 17, 1965, he reported that he had had one episode of unconsciousness in the past two weeks of five or ten minutes duration followed by increased headache for several hours. Again, on December 13, 1965, he reported two periods of unconsciousness. On January 25, 1966, he reported four episodes of unconsciousness over the preceding five weeks.

During 1966, these symptoms continued. On November 3, 1966, petitioner was admitted to the Veterans Administration Hospital in Martinez for extensive analysis and treatment for these symptoms: severe headache, periods of unconsciousness, weakness of the left side of the body, and acute chest pains, all of which continued during the stay in the hospital in 1967. While in the Veterans Administration Hospital petitioner underwent psychiatric therapy. Petitioner was discharged from the Veterans Administration Hospital on June 29, 1967.

During 1967, petitioner had developed severe abdominal pain and was in and out of the hospital several times during the remainder of 1967 and the early part of 1968 due to the recurrence of all the various symptoms listed previously.

It was the diagnosis of both Dr. Lamond and Dr. Anderson, a Veterans Administration neurologist, that some of petitioner's periods of unconsciousness were psychophysiological (emotional) in character and that others were not of this variety but were rather true syncopal attacks. It is Dr. Lamond's belief that some of the syncopal episodes may be due to alterations in circulation to the right temporal lobe caused by the abnormal venous pathways in the right temporal lobe found in the exploratory craniotomy. Dr. Lamond also diagnosed petitioner's headache problem as being due to emotional stress. On October 20, 1967, Dr. Lamond assessed petitioner's disability as total. He felt that petitioner was unemployable because of his periods of unconsciousness and

his physical weakness. The doctor was not impressed by petitioner's claims of severe headache as a disabling factor. Dr. Lamond further stated that it was probable that a portion of this disability was due to the industrial injury, but that a good deal of it was unrelated to that industrial injury and was rather due to a multitude of factors, including his history of unconscious episodes and other problems of a psychophysiological or emotional nature. Dr. Lamond stated: "In an effort to reach some equitable and final settlement through compromise and release, I would suggest that a fifty percent factor be given to his industrial disability and fifty percent to pre-existing problems.

Under recent decisions of the California Supreme Court, this suggestion of an apportionment by the doctor cannot alone constitute substantial evidence to support the findings of the board. (*Berry* v. *Workmen's Comp. App. Bd.*, *supra*, 68 Cal.2d 786; *Zemke* v. *Workmen's Comp. App. Bd.*, *supra*, 68 Cal.2d 794.) First, the doctor admits that his conclusion is an attempt to reach a final settlement through compromise, rather than a medical assessment. Second, the doctor has drawn a legal rather than a medical conclusion of fact or opinion. These two recent cases held that an estimate of a 50-50 apportionment made by a doctor in an attempt to achieve fairness for a settlement, unsupported by other evidence in the record, was a legal conclusion by the doctor, which could not constitute substantial evidence to support the findings of the board. (*Berry* v. *Workmen's Comp. App. Bd.*, *supra*, 68 Cal.2d 786, 791; *Zemke* v. *Workmen's Comp. App. Bd.*, *supra*, 68 Cal.2d 794, 798-799.) In *Zemke*, *supra*, at page 798, the court states: "Although the board must rely on expert medical opinion in resolving the issue of apportionment, an expert's opinion which does not rest upon relevant facts or which assumes an incorrect legal theory cannot constitute substantial evidence upon which the board may base an apportionment finding [citations]."

A detailed reading of the record makes clear that there is much uncertainty on the part of the medical experts as to the source and causes of petitioner's medical problems. At several points, they frankly admit that their diagnoses and opinions are based on pure speculation. However, the honest medical opinion of a specialist in his given field is proper evidence upon which the board may properly rely in making an award and will constitute substantial evidence, even though these opinions are not based on verifiable certainty.

It is petitioner's contention that his operation in May of 1964 cured, or at least alleviated, all his previous symptoms of distress. He alleges that he was feeling fine, was full of energy, and was free from complaint of headaches from the date of his first craniotomy on May 29, 1964 to the date of his accident on August 19, 1964. Because petitioner's distressful symptoms returned subsequent to the industrial injury in August of 1964, he contends that that injury is the sole proximate cause of these symptoms which now are responsible for his total disability.

There is some evidence in the record which could support this contention. The evidence seems uncontradicted that the petitioner was feeling much better after the first craniotomy and at least reported that he was free from the distressing headaches, unconsciousness, and weakness. Petitioner reported this to Dr. Lamond on July 29, 1964, and this is verified by the testimony of his wife and his fellow workers.

Some measure of support for petitioner's contention that the industrial injury was the precipitating cause of his total disability is found in the report of Dr. Elmer C. Anderson, the Veterans Administration neurologist, who felt that petitioner's symptoms are psychophysiological (hysterical) in nature, and were probably precipitated by the falling door. Dr. Anderson states: "By history from the patient and his wife, these hysterical episodes have only occurred since the accident in which he was struck on the head by a refrigerator door. If this can be substantiated, i.e., research of history prior to the accident, then it must be assumed that this accident was a precipitating factor to this man's psychophysiological reaction and total dependency status." However, as can be seen from a reading of Dr. Anderson's statement, he had been told, incorrectly, by the petitioner and his wife that petitioner had no prior history of such symptoms. As can be seen from the record, petitioner did, in fact, have a long history of such symptoms. It is noteworthy that the doctor carefully qualified his diagnosis on the assumption that there was no such prior history.

Petitioner also points to testimony in the deposition of Dr. Lamond where Dr. Lamond indicates that "It is possible" and "It is a possibility" that the industrial injury was the cause of the unconsciousness and headaches; however, it is obvious that he is in no way certain that this is so, and he did not give it as his medical opinion. These admissions by the doctor that it is possible that the symptoms were caused by the industrial injury is contradicted elsewhere in his own tes-

timony and by other medical evidence; for example, in his letter of October 20, 1967, in which he makes the 50-50 assessment, Dr. Lamond says that he believes that much of petitioner's problem is unrelated to the industrial injury.

"Mr. Peterson, in my opinion, is totally disabled for gainful employment. This total disability results from a multitude of factors including a history of unconscious episodes which makes him a job risk, chronic, and to the patient, incapacitating headache with heavy physical work and definite emotional problems. I believe that because of the patient's statement prior to his head injury, that he was feeling extremely well (this subsequent to his initial craniotomy), that some portion of his present disability is certainly attributable to the industrial accident. We occasionally see a single traumatic episode being the sufficient final cause to produce decompensation."

In his deposition Dr. Lamond further states: ". . . . I think in all fairness I will have to state I do not think all the patient's symptoms occurred subsequent to his being hit by the refrigerator door as the doctor [Dr. Anderson] stated here. Many of the patient's symptoms occurred or were present prior to that industrial injury."

When asked what effect the first craniotomy could have had in curing petitioner's preexisting symptoms, the doctor stated that it was possible that even an exploratory surgery could possibly have relieved petitioner's headaches. But, it was also the doctor's opinion that the exploratory surgery could have in no way cured or alleviated the petitioner's preinjury episodes of unconsciousness.

The doctor further stated that in his opinion some of the episodes of unconsciousness were emotional in origin and that some were not. He stated that he really did not have an explanation for the right-sided headaches, but believed that part of these headaches which Mr. Peterson had had for many years were a fixed response to stress, which would make these headaches psychophysiologic in origin.

The doctor further indicates that his feeling that petitioner is totally disabled is not based on his frequent complaint of headaches, but rather upon his successive episodes of unconsciousness and the fact that he is usually quite weak.

Dr. Lamond's general conclusions as to the source or cause of many of petitioner's symptoms is concurred in by Dr. Finley, who interviewed and examined petitioner on May 27, 1965. Dr. Finley states: "From a review of the previous medical reports and hospital records, I agree that there is no

objective indication to suggest that the patient's head injury complicated his previous intracranial symptoms and the resulting craniotomy, nor are there later medical observations or findings to suggest continuing or persistent complications from the head injury itself.'' Dr. Finley further states in conclusion: ''. . . it is unlikely that the continuing findings can be attributed as a residual of the industrial head injury in view of the preexisting neurological symptoms and craniotomies. . . .''

Finally, Dr. Lamond's and Dr. Finley's assessments that petitioner's present symptoms are largely due to his emotional or psychophysiological problems which existed previous to the industrial injury and which are unrelated to that injury, are confirmed by the fact that the records show that the diagnosis of Drs. Huff and Lamond made in May of 1964, before the craniotomy and the accident, was almost exactly the same as the diagnosis made by Dr. Anderson of the Veterans Administration in 1967. This diagnosis was syncope, exact etiology undetermined; hysterical nervous system reaction manifested by frontal headaches and body weakness; hysterical chest pain; and hysterical gastric distress.

There appears to us to be substantial evidence to support the findings of the board that a considerable part of petitioner's total disability is unrelated to the industrial injury but is due to the natural progression of his preexisting pathological condition. The testimony of Dr. Lamond himself seems in places to be somewhat contradictory. However, substantial evidence, even if contradicted, well supported the findings of the board. Also, it is well established that the trier of fact may accept part of the contradictory testimony of a witness when supported by other evidence in the record.

There being substantial evidence in the record upon which to base the determination of apportionment in this case, the award of the Workmen's Compensation Appeals Board should be upheld.

The award of permanent disability compensation is affirmed.

Gargano, J., concurred.