[Civ. No. 13286. Fourth Dist., Div. Two. Mar. 7, 1974.]

RICHARD C. GREENBERG, Petitioner, v.
WORKMEN'S COMPENSATION APPEALS BOARD, ROYAL
DRUG COMPANY, et al., Respondents.

## COUNSEL

Charles R. Metcalfe, Nicholas C. Byhower and Richard W. Petherbridge for Petitioner.

Samuelsen, Bolson, Whitehead & Benes and Ben Whitehead for Respondents.

## OPINION

**KERRIGAN, Acting P. J.**—This case involves a pharmacist ("Petitioner") who was stricken with a heart attack at work. He filed a claim against the drug firm employing him and its compensation carrier ("Respondents"). The trial referee issued findings and award determining the employee's heart injury arose out of his employment and that he suffered a 56 percent disability as a result thereof. The Workmen's Compensation Appeals Board ("Board") reversed the referee's finding that the injury arose out of the employment and held that the employee was not entitled to any compensation.

We issued a writ of review for the purpose of determining the integrity of the Board's decision. We have reviewed the entire record for the

purpose of deciding whether there is substantial evidence to uphold the Board's order denying benefits. We have concluded that the Board was wrong in denying compensation and that the trial referee was right in awarding benefits.

Richard C. Greenberg suffered an acute myocardial infarction while at work on May 10, 1972, resulting in permanent partial disability. The only issue is the relationship, if any, of the heart attack to his work.

Petitioner was born in 1921. He has been a pharmacist since 1952. During the years 1960-1969, he owned his own pharmacy, maintaining hours of 9-6 during the week and 9-2 on Saturday. On Sunday, the store was closed.

In January 1970, he went to work for Royal Drug Company, working a five-day week. He was off every Sunday and usually a Wednesday or Saturday in addition to Sunday. However, in addition to his Royal Drug employment, he also worked every other Sunday for another pharmacy.

At Royal, petitioner filled approximately 65 prescriptions a day and was generally on his feet during the entire 8 hours. The State Board of Pharmacy considers 50 prescriptions as the maximum to be filled daily by any one pharmacist.

On the day of the attack (May 10, 1972), petitioner went to work at 9 a.m. The attack occurred about 12:15-12:30 p.m. He was removed to the hospital where he remained in the cardiac unit until May 31.

Petitioner's doctor filed a report in support of the application for benefits to the following effect: Greenberg had been experiencing progressive sclerosis of his coronary arteries for 25-30 years. The emotional stress to which he was subjected in the course of his employment by Royal Drug materially aggravated and accelerated the process within his coronary arteries, making him more susceptible to the complications of this condition. The exertion required by his employment significantly increased the work of his heart and thereby precipitated a coronary artery occlusion in one of his diseased coronary arteries. This occlusion led to severe coronary insufficiency and a myocardial infarct. He is permanently partially disabled and his future efforts must be confined to sedentary work and work that does not expose him to emotional stress. He will require medical care the rest of his life.

Respondents' medical expert filed a report indicating that Greenberg had a personal and family history of arteriosclerotic heart disease; he was obese (5'11"—230-235 lbs.) and a heavy cigarette smoker; the arteriosclerosis, obesity and cigarette consumption caused the attack, not the employment.

In an effort to resolve the conflict between the petitioner's doctor and respondents' physician, the referee appointed an independent medical examiner, Dr. Martin Klein. Dr. Klein conducted a thorough examination of the applicant. His important findings and his opinion are set out in toto:

"Mr. Richard C. Greenberg was seen in consultation at your [the referee's] request on October 24, 1972. He received a complete history and physical examination in addition to certain laboratory procedures which will be described below. In addition, I have reviewed the reports of the previous consultants, Drs. Frank [petitioner's doctor] and Smith [respondents' physician] and also the records of his hospitalization at St. Joseph Hospital.

"History: The patient is a 50-year old married man who was employed as a pharmacist by the Royal Drug Company at the onset of his illness. He had apparently been in excellent health until the onset of his illness on May 10, 1972. On that date while at work . . . he experienced an epigastric substernal pain which became very intense with resulting diaphoresis and weakness. . . . [H]e was taken to St. Joseph Hospital where he was seen originally in the emergency room . . . and admitted to the coronary care unit. A diagnosis of inferior wall myocardial infarction was made. He was treated with bed rest and anticoagulants. He was hospitalized from May 10, 1972 until May 30, 1972 at which time he was discharged. . . . Following discharge from the hospital, the patient gradually increased his activities and returned to his former occupation and place of employment on August 1, 1972. He stopped working on September 15 because of his intention to relocate in northern California in a suburb of Sacramento. He is on no medication at present.

". . . . . . . . . . . . . . . . . .

"The patient smoked from 1 to 1½ packages of cigarettes a day most of his adult life until the onset of his present illness. . . .

"The patient has been a pharmacist for approximately the past 20 years. . . . He states that the Royal Drug Store was a rather busy store. He worked together with another pharmacist who is a part owner in the store. Between them they filled approximately 130 prescriptions a day. He worked a five day, forty hour week. . . . In addition to that he had a job at another pharmacy, working every other Sunday, prior to his heart attack. The patient feels that *filling approximately 65 prescriptions in a working day was working exceptionally hard since the State Board recommended a few years back that 50 prescriptions a day should be a maximum.* He feels that this is important because of the accuracy required in filling a prescription. The morning that he worked preceding his heart attack was

apparently his usual busy morning, similar to those mornings in which he had worked in the last 2½ years. It was not unusually busy and no unusual events occurred in the course of the morning. He was performing his usual job which he had done for the past 2½ years when he had the onset of his illness.

"Family history: His father died at the age of 79 of a stroke. His mother died at the age of 68 of a heart attack. She had had angina pectoris for many years. One brother died at the age of 53 of a heart attack and had been ill for five years. Another brother died at the age of 49 of a heart attack. A sister died at the age of 51 of a heart attack. He has five sisters, ranging in age from 65 to 44 who are alive and well and who have no symptoms of heart disease. . . .

"   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"Discussion: There is no question concerning the diagnosis of arteriosclerotic heart disease with inferior wall infarction in this patient. The consulting physicians, as well as his attending physician, have all agreed with this as have I. There is also no question that this acute event occurred while at work. *The question that, therefore, arises is whether . . . the patient's employment was a factor in the cause of his disease.* The factors which have been implicated in causing arteriosclerotic cardiovascular disease with subsequent coronary occlusion and myocardial infarction in general have been those factors which are hereditary and are usually related to abnormalities in blood lipids, hypertension, obesity, cigarette smoking, and the stresses and strains involved in certain professions and occupations. Coronary atherosclerosis is a disease which develops slowly over many years. The acute attack of a coronary occlusion has been related to certain physical and emotional stresses of an undue nature, but for the most part usually occurs without any such precipitating event. In this particular individual, there was no evidence that there was any undue emotional or physical stress or strain on the day of his coronary occlusion. According to the patient, it was his usual working day. In regard to predisposing factors, the patient certainly does have a family history of coronary disease. He was a cigarette smoker and he was also obese. . . .

"There is no evidence of hypertension. *The patient does give a history, however, of being under emotional tension and stress by his occupation. The amount of stress present in the pharmacy occupation is difficult for me to evaluate. It would probably require testimony from other pharmacists.* However, what might be stressful to one individual may not be stressful to another with a different temperament. *However, if it can be ascertained that 50 prescriptions a day is the usual amount filled by the average pharmacy by a single pharmacist then filling 65, or 30% more, certainly*

*would appear to put the employee under a greater than normal stress. It is, therefore, obvious that Mr. Greenberg had several predisposing factors to coronary disease which were not work related and I will repeat that these included family history, obesity, and cigarette smoking. The factor which could be implicated as related to his job is that of emotional stresses involved in the job. Therefore, to some extent his illness, that of atherosclerosis, may have been contributed to by the tension of his job and perhaps [the] acute event of myocardial infarction may have also been to some extent contributed to by the same stresses.*

"At this time the patient's disability is permanent and stationary for rating purposes. *I have discussed above those factors which I believe are non-work related and the single factor, that of emotional stress which is possibly related to his employment.* . . . The patient will need medical supervision for the rest of his life. . . . His decision to change his life style by moving to a smaller community and obtaining work in a less busy pharmacy is a step in the right direction for prolonging his life. . . ." (Italics supplied.)

Respondents objected to Dr. Klein's conclusions and requested a hearing for the purpose of cross-examining him.

A hearing was held and the following is the referee's summary of Dr. Klein's testimony:

"Before the preparation of his report he [Dr. Klein] reviewed the reports of Dr. Frank [applicant's doctor] and Dr. Smith [respondents' doctor] and applicant's testimony. He is generally familiar with the duties of a pharmacist. Almost none of the prescriptions are compounded; it is necessary to put the proper instructions on the label. . . . *The major contributing factors [in causing the disability] were the periods of extra work load.*

". . . . . . . . . . . . . . . . . .

"*There are stresses involved in properly filling prescriptions. . . .*"

In denying compensation benefits, the Board made the following statement in its opinion and order granting reconsideration and decision after reconsideration: it had reviewed the file and the referee's report; it noted that there was a conflict in Dr. Frank's opinion (petitioner's doctor), Dr. Smith's opinion (respondent's doctor) and that an I.M.E. had been appointed by the referee; it found that the referee had based his finding on the applicant's testimony and the I.M.E.'s report; however, it was not persuaded by this evidence in that Dr. Klein's report was equivocal; it was phrased in terms of medical *possibilities* rather than *probabilities*

(e.g., "The amount of stress present in the pharmacy occupation is difficult for me to evaluate. . .") ; similarly, petitioner's testimony to the effect he worked under stress was not particularly probative; there was no indication that his employment with Royal Drug was any more stressful than any other job he had held.

Consequently, the Board found that the heart attack was due solely to applicant's pre-existing condition and that he had failed to prove that the injury was work-related.

However, it should be emphasized that the Board either intentionally ignored or inadvertently overlooked Dr. Klein's *testimony* (as contrasted with his report) to the effect that the major contributing factors causing Greenberg's injury and disability were the extra work load and the stress involved in properly filling 65 prescriptions a day—15 more than the recommended maximum.

■ Turning to the merits, it is well-settled that an employee subjected to repeated physical or mental strain over an extended period of time who suffers a vascular accident as a result thereof is entitled to compensation. (*Fireman's Fund Indem. Co.* v. *Ind. Acc. Com.,* 39 Cal.2d 831, 834 [250 P.2d 148].) ■ Disability or death resulting from a heart attack is compensable, even though the idiopathic condition previously existed. (*Lumbermen's Mut. Cas. Co.* v. *Ind. Acc. Com.,* 29 Cal.2d 492, 496 [175 P.2d 823].) Industry takes the employee as it finds him; a person suffering from a pre-existing disease who is disabled by an injury arising out of the employment is entitled to compensation. (*Berry* v. *Workmen's Comp. App. Bd.,* 68 Cal.2d 786 [69 Cal.Rptr. 68, 441 P.2d 908]; *Liberty Mut. Ins. Co.* v. *Ind. Acc. Com.,* 73 Cal.App.2d 555, 558-559 [166 P.2d 908].)

There is no question that Greenberg suffered a heart attack on the job or that he is permanently disabled. The crucial question is whether the Board's conclusion that his injury was not connected with his employment is valid. In its order denying compensation, the Board held that Greenberg had failed to prove the attack was work-connected.

But there was strong proof of industrial causation. It is true there was a conflict on the causation issue in the reports of petitioner's physician and respondents' doctor. In order to resolve the conflict, the referee appointed an independent medical examiner. The I.M.E. filed the aforesaid written report. He also testified. ■ His testimony constituted substantial proof to the effect that the attack was work-related. Consequently,

Greenberg sustained his burden of proof. (See *Garza* v. *Workmen's Comp. App. Bd.,* 3 Cal.3d 312 [90 Cal.Rptr. 355, 475 P.2d 451].)

Under the scope of judicial review in workmen's compensation cases, the court is to review the entire record to determine whether the conclusion of the Workmen's Compensation Appeals Board is supported by substantial evidence. (*LeVesque* v. *Workmen's Comp. App. Bd.,* 1 Cal.3d 627 [83 Cal.Rptr. 208, 463 P.2d 432].) In reviewing the decisions of the Workmen's Compensation Appeals Board, the test of substantiality must be measured on the basis of the entire record, rather than by simply isolating evidence which supports the Board and ignoring other relevant facts of record which rebut or explain that evidence. (*LeVesque* v. *Workmen's Comp. App. Bd., supra,* 1 Cal.3d 627, 638-639, fn. 22; *Garza* v. *Workmen's Comp. App. Bd., supra,* 3 Cal.3d 312, 317.)

Here, the Board entirely ignored Dr. Klein's *testimony* and overturned the referee's finding of work-causation based upon that report. Dr. Klein's testimony clarified his written report. While his written report may have been somewhat equivocal, his testimony was clear and convincing. He testified that the stress incurred by Greenberg in filling 65 prescriptions a day caused emotional stress and that such stress, coupled with the pre-existing, nondisabling arteriosclerotic condition, culminated in the infarction. The Board committed grave error in ignoring such testimony and in reversing the trial referee inasmuch as the latter's finding of compensable injury was supported by solid evidence and should have been accorded great weight. (*Garza* v. *Workmen's Comp. App. Bd., supra,* 3 Cal.3d 312.)

The decision (opinion and order granting reconsideration and decision after reconsideration) of the Board is annulled; and the cause is remanded to the Board for further proceedings consistent with the views expressed herein.

Tamura, J., concurred.

**KAUFMAN, J.**—I respectfully dissent.

The Board was quite correct in characterizing Dr. Klein's report as equivocal at best. The Board also acted properly in ignoring Dr. Klein's testimony. Notwithstanding the referee's summary of evidence, the transcript of Dr. Klein's testimony discloses that his testimony added nothing of substance to his report.

The question for this appellate court is whether the Board's order is

supported by substantial evidence on the whole record. (Lab. Code, § 5952; *LeVesque* v. *Workmen's Comp. App. Bd.,* 1 Cal.3d 627, 637 [83 Cal.Rptr. 208, 463 P.2d 432].) The medical report from respondents' medical expert alone constitutes substantial evidence to support the Board's order. The majority improperly reweigh the evidence and substitute their judgment for that of the trier of fact.

I would affirm the Board's order.