[L.A. Nos. 30204, 30205. In Bank. Apr. 19, 1974.]

ROSE W. LAMB, Petitioner, v.
WORKMEN'S COMPENSATION APPEALS BOARD,
KEYSTONE ENGINEERING COMPANY et al., Respondents.

276

**COUNSEL**

Joseph E. Hall for Petitioner.

Franklin Grady, Sheldon C. St. Clair, Thomas J. McBirnie and Norman R. Samuelsen for Respondents.

## OPINION

SULLIVAN, J.—In these proceedings, presented by two separate petitions upon a single record,[1] petitioner Rose W. Lamb, widow of the decedent John H. Lamb, seeks review of the decision after reconsideration of the Workmen's Compensation Appeals Board (Board) holding, contrary to the findings and award of the referee, that Lamb's death did not result from an injury to his heart arising out of and occurring in the course of his employment.

John H. Lamb was employed for approximately 24 years prior to his death by respondent Keystone Engineering. His job involved the operation of machines which made precision gears from steel blanks.

In 1963 it was discovered that Lamb suffered from moderate hypertension. He was given no treatment at that time but continued to work until sometime in 1969 when symptoms of fatigue and shortness of breath caused him to again consult a doctor. It was found that his hypertension had increased to a more dangerous level and he was required to stop work for approximately one month while a program of rest and medication was administered to him. After returning to work Lamb continued to make periodic visits to the doctor for approximately six months or until June of 1970. He continued to take prescribed medication and also continued to have occasional symptoms of fatigue and chest pains.

On July 16, 1970, Lamb arose at 5:30 a.m., as was his habit. He had worked the preceding 10 days without having a day off and had worked overtime on 7 of those 10 days. He complained to his wife that he was tired and she asked him to remain home from work. He declined to do so, stating that there was too much work to be done, and he left for work at 6:15, arriving there at 7. About 10 a.m. Lamb had some difficulty with a gear he was making and called for the assistance of his supervisor.

---

[1]The first petition for writ of review was filed following the opinion, order, and decision after reconsideration (which rescinded the findings and award of the referee and substituted therefor findings and an award in favor of respondents) but prior to the opinion and order denying petitioner's subsequent petition for reconsideration. The second petition for writ of review, identical to its predecessor in all relevant respects, was filed following the latter order. Because the first petition for writ of review was timely and not in violation of the rule of section 5901 of the Labor Code (see *Harlan* v. *Industrial Acc. Com.* (1924) 194 Cal. 352, 365 [228 P. 654]; see also Cal. Workmen's Compensation Practice (Cont.Ed.Bar 1973) § 11.15, p. 364), and because the writ of review issued by this court with respect to this petition has performed its function of bringing the record before us for review and determination, it is unnecessary for us to consider any possible effect of the writ of review issued with respect to the second petition.

While the two were engaged in making measurements Lamb left momentarily to find a pin that was used for this purpose. After a few minutes another employee came to tell the supervisor that Lamb was lying on the floor under one of the machines. He was dead.

The four doctors who testified before the referee, only one of whom had treated Lamb during his lifetime, unanimously concluded that the immediate cause of death was an "arrhythmia" or ventricular fibrillation. All agreed in addition that emotional or physical stress could cause or aggravate heart disease, and two of the doctors were of the view that Lamb's demise was contributed to by his work, largely as a result of the emotional stress which he experienced on the job.[2] Two other doctors, however, were of the opposite view: they concluded that Lamb's job involved no emotional or physical stress sufficient to merit consideration as a contributing factor.[3] The referee rejected this latter view, accepting instead that of the other two doctors. Her conclusion was that "The demands of exacting employment, involving customer time schedules, preci-

---

[2] The evidence relating to actual emotional stress was in substance that Lamb, a small man of Chinese descent, was extremely conscientious about his work and sensitive to criticism by his superiors. He often complained to his wife that there was too much work to do, especially when he worked the day shift—as he did at the time of his death; there was then no one to help him and he had to run two machines by himself. The work in which Lamb was engaged was high precision work involving the duplication of a gear sample furnished by the customer. When a mistake on the part of the operator led to the ruining of a blank, criticism was inevitable because the blank was furnished by the customer and some blanks were quite expensive. (On the day of his death Lamb was working on a gear for a military job; this gear was seven to eight feet in diameter and weighed 600 or 700 pounds.) Because of his conscientiousness Lamb did not ruin many blanks. Lamb tended to become upset at small matters such as having to go upstairs to find out how many teeth to put on a gear. He also seemed to become excited and confused when there were large orders. His superior would tell him just to do what he could in his eight hours, but Lamb worked overtime when there was a large amount of work to do—"usually 2 hours per night, 3 nights per week, 8 hours on Saturday and occasionally 8 hours on Sunday."

[3] In her report and recommendation on reconsideration the referee stated her reasons for rejecting the opinions of the two doctors ultimately relied upon by the Board: "Dr. Winsor testified that if he had a patient approximately 60 years of age with the cardiac and other conditions indicated in decedent's autopsy report, 'whether he would warn that patient not to work seven days per week would depend upon how hard the individual's job was. Witness cannot imagine an easier job than decedent's . . . .' [Quotation from summary of evidence.] [¶] The referee rejected Dr. Winsor's opinion as his testimony that he would permit a 60-year-old cardiac patient to work seven days per week seemed exaggerated and his opinion regarding decedent's duties seemed superficial. [¶] Dr. Alvin Markovitz testified for petitioner [employer's insurer] that he believes emotional stress can cause or aggravate heart disease but that there is nothing in the history to indicate decedent was in a stressful situation. [¶] The referee rejected Dr. Markovitz' opinion, as she disagreed with his analysis of decedent's job duties and situation."

sion work and the risk of loss of expensive materials, coupled with decedent's underlying cardiac pathology, appear to have rendered his cardiac reserve insufficient for the grueling last days of his life, when he worked 10 hours per day [on 7 out of] 10 consecutive days." The basis of this conclusion was her finding, resting upon lay testimony in the record, that there was indeed "considerable emotional stress and some physical stress as well." This testimony was summarized by the referee as follows: "Emotional stress predominated, due to the exacting nature of the work and decedent's conscientiousness." The referee therefore concluded that petitioner as Lamb's widow was entitled to the statutory death benefit. (Lab. Code, § 3600.)

On reconsideration the Board rescinded the findings and award of the referee and substituted therefor an award of litigation expenses and nominal attorneys fees. Concluding that, contrary to the referee's conclusion, Lamb's death did not result from an injury to his heart arising out of and occurring in the course of his employment, the Board found that a preponderance of the evidence supported the opinion of the two doctors whose testimony had been rejected by the referee. In its opinion the Board reviewed the lay evidence concerning the *physical* strain involved in Lamb's job.[4] It then recited the testimony of one of the doctors to the effect that a certain amount of exercise is good for heart patients and that he, the doctor, "[could not] imagine an easier job than decedent's." No specific mention was made of the evidence of *emotional* stress. The opinion of the Board concluded with the following language: "We recognize that stress and strain like beauty 'is in the eyes of the beholder.' However, the preponderance of both the lay and medical evidence persuades us that decedent's job did not subject him to the type of stress and strain which could cause, aggravate or precipitate his untimely death."

At this point it was petitioner's turn to seek reconsideration.[5] The Board, denying the petition, had recourse to language strongly reminiscent

---

[4] The Board noted: "Several co-workers testified to the nature and extent of decedent's duties. *Occasionally* he had to lift pieces of stock. *Occasionally* he had to check with the office as to how the gear cutting was to be done. *Occasionally* he stayed at his automatic machine overtime to finish a job that he had started. But mostly he watched his machine do its work, periodically checked its progress." (Italics added.)

[5] We note in passing that although a petition for reconsideration is proper in these circumstances—i.e., when the Board's initial decision on reconsideration reverses the referee's decision (see *Brunau* v. *Industrial Acc. Com.* (1933) 135 Cal.App. 277 [26 P.2d 672])—it is not a prerequisite to seeking a writ of review. (*Harlan* v. *Industrial Acc. Com., supra,* 194 Cal. 352, 365; see also Cal. Workmen's Compensation Practice, *supra,* § 11.15, p. 364.)

of that used by it in its first opinion (see fn. 4, *ante,* and accompanying text): "Applicant presented lay evidence that *sometimes* her husband lifted on his job, *sometimes* he had to meet a deadline, *sometimes* he was reprimanded by his supervisor, *sometimes* he chose to work overtime, *sometimes* he had to pay attention and concentrate on what he was doing, etc. However these facts by themselves do not show that decedent's job was inherently stressful much less stressful to him." (Original italics.) The Board went on to observe that "applicant presented no evidence that the duties and/or responsibilities of her husband's job produced any symptoms at or near the time he performed them," and that when last seen by his attending doctor in June of 1970 decedent had complained of no symptoms and had not indicated that he was working beyond his physical capacity. "On the other hand," the Board went on to observe, "the other examiner and/or medical witnesses indicated that with the severe degree of rheumatic heart disease, arteriosclerotic heart disease and hypertension from which decedent suffered, he was likely to drop dead at any time regardless of what activity he happened to be engaged in at that time."

The Board concluded its second opinion on reconsideration as follows: "We realize that in cases such as this, most of the medical evidence has to be 'after the fact,' based on assumptions and hypothetical questions, etc. We also realize that medical opinions on cause and effect are always somewhat speculative and/or conjectural. But here the particular opinions that applicant relies upon are just too speculative and weak, for they assume the very facts in issue. Therefore, we are still of the opinion applicant has not met her burden of proving that the job was in fact stressful and this stress did in fact contribute to his death."

We hold that the decision of the Board in this case must be annulled and the cause remanded for further proceedings in light of the four elementary principles which we now proceed to reiterate.

*First.* ■ "Although the employee bears the burden of proving that his injury was sustained in the course of his employment, the established legislative policy is that the Workmen's Compensation Act must be liberally construed in the employee's favor (Lab. Code, § 3202), and all reasonable doubts as to whether an injury arose out of employment are to be resolved in favor of the employee. (*Lundberg* v. *Workmen's Comp. App. Bd.,* 69 Cal.2d 436, 439 . . . .) *This rule is binding upon the board and this court. (Id.* at p. 439.)" (*Garza* v. *Workmen's Comp. App. Bd.* (1970) 3 Cal.3d 312, 317 [90 Cal.Rptr. 355, 475 P.2d 451].) (Italics added.)

*Second.* ■ "[A]lthough the board is empowered to resolve con-

flicts in the evidence [citations], to make its own credibility determinations [citations], and upon reconsideration to reject the findings of the referee and enter its own findings on the basis of its review of the record [citations], nevertheless, any award, order or decision of the board must be supported by substantial evidence *in the light of the entire record* (Lab. Code, § 5952; *LeVesque* v. *Workmen's Comp. App. Bd.,* 1 Cal.3d 627, 635 . . . )." (*Garza* v. *Workmen's Comp. App. Bd., supra,* 3 Cal.3d 312, 317.) (Italics added.) The foregoing standard is not met "by simply isolating evidence which supports the board and ignoring other relevant facts of record which rebut or explain that evidence." (*Id.* at p. 317.)

*Third.* ■ "As a general rule, the board *'must accept as true the intended meaning of [evidence] both uncontradicted and unimpeached.'* (*LeVesque* v. *Workmen's Comp. App. Bd., supra,* 1 Cal.3d 627, 639; *McAllister* v. *Workmen's Comp. App. Bd., supra,* 69 Cal.2d 408, 413; see *Wilhelm* v. *Workmen's Comp. App. Bd., supra,* 255 Cal.App.2d 30, 33.)" (*Garza* v. *Workmen's Comp. App. Bd., supra,* 3 Cal.3d 312, 317-318.) (Italics added.)

*Fourth.* ■ When a referee's finding of compensable injury is supported by solid, credible evidence, it is to be accorded great weight by the Board and should be rejected only on the basis of contrary evidence of considerable substantiality. (*Garza* v. *Workmen's Comp. App. Bd., supra,* 3 Cal.3d 312, 318-319; *Greenberg* v. *Workmen's Comp. Appeals Bd.* (1974) 37 Cal.App.3d 792, 798-799 [112 Cal.Rptr. 626].)

In the instant case the Board has utterly failed to observe and apply the foregoing principles. The sole issue before the Board was whether decedent's employment was a *contributing cause* of his death.[6] As indicated

---

[6]The well-settled law on this point is stated by Hanna as follows: "Most cases of disability or death resulting from heart pathology involve a preexisting subnormal or diseased heart condition which is assertedly made disabling by the employment. The general principles governing such cases are:

"(1) the employee is entitled to compensation for any disability proximately caused by an industrial injury, whether his condition was average or subnormal;

"(2) he is entitled to compensation where an existing infirmity is aggravated by the employment, even though a normal man would not have been adversely affected by the same circumstances;

"(3) the rule is unchanged even where it is shown that the employee would eventually have died from the disease, regardless of the employment, if there is competent substantial evidence that the employment hastened or produced the disability or death;

"(4) the question of whether the employment precipitated the collapse of a diseased heart prior to the time when normal progress of the disease would have brought on such collapse is one of fact; and

"(5) if the employment precipitated the heart attack or aggravated a preexisting

above, the four doctors who testified in this case all agreed that stress, whether emotional or physical, could aggravate heart disease. The referee, relying on the lay evidence summarized in footnote 2, *ante,* concluded that decedent experienced emotional stress in his employment "due to the exacting nature of the work and decedent's conscientiousness"—and on this basis she concluded that the injury was work-related. The Board, overturning the findings and award of the referee, rested its contrary determination in its first opinion on reconsideration upon an assessment of the *physical* demands of decedent's position. It chose not to address itself to the undisputed evidence in the record that decedent actually experienced *emotional* stress in his job, contenting itself to observe that "stress and strain like beauty 'is in the eye of the beholder.' "

When the applicant, Mrs. Lamb, sought further reconsideration on this point, the Board responded with what amounted to a reiteration of its former opinion. (See fn. 4, *ante,* and compare with text following fn. 5, *ante.*) At no time, however, did it address itself to the uncontradicted and unimpeached evidence to the effect that the responsibilities of decedent's employment, although perhaps not of the nature that would produce emotional stress in every man or most men who might be subject to them, *did in fact result in considerable emotional stress to John Lamb.*

■ "Industry takes the employee as it finds him. A person suffering from a preexisting disease who is disabled by an injury proximately arising out of the employment is entitled to compensation even though a normal man would not have been adversely affected by the event." (*Liberty Mut. Ins. Co. v. Ind. Acc. Com.* (1946) 73 Cal.App.2d 555, 559 [166 P.2d 908]; see also *Zemke v. Workmen's Comp. App. Bd.* (1968) 68 Cal.2d 794, 799-800 [69 Cal.Rptr. 88, 441 P.2d 928]; *Berry v. Workmen's Comp. App. Bd.* (1968) 68 Cal.2d 786, 793 [69 Cal.Rptr. 68, 441 P.2d 908]; *Lumbermen's Mut. Cas. Co. v. Ind. Acc. Com.* (1946) 29 Cal.2d 492, 496 [175 P.2d 823]; *Tanenbaum v. Industrial Acc. Com.* (1935) 4 Cal.2d 615, 617-618 [52 P.2d 215]; *Spillane v. Workmen's Comp. App. Bd.* (1969) 269 Cal.App.2d 346, 349 [74 Cal.Rptr. 671]; *Peterson v. Workmen's Comp. App. Bd.* (1968) 266 Cal.App.2d 818, 820-821 [72 Cal.Rptr. 545]; see generally 2 Hanna, Cal. Law of Employee Injuries and Workmen's Compensation, *supra,* § 11.02[2], p. 11-13.) By the same token it is not the Board's assessment of the amount of stress *inherent*

---

disease, apportionment will be granted if and to the extent that it can be medically established that the preexisting disease or its normal progression also contributed to the resulting disability." (2 Hanna, Cal. Law of Employee Injuries and Workmen's Compensation (2d ed. rev. 1973) § 11.03[5][e], p. 11-44.) (Fns. citing cases omitted.)

in a workman's employment which governs in matters of stress-caused injury, but rather the Board's determination of the amount of stress which the particular employment has *in fact* exerted upon the particular workman.[7]

■ In the instant case the Board utterly failed to make the indicated determination and, in so doing, wholly ignored competent and substantial evidence on the point which was both uncontradicted and unimpeached.[8] This it may not do. Although the Board may choose to disbelieve relevant uncontradicted and unimpeached evidence if it has grounds other than mere speculation and conjecture to do so (see *Garza* v. *Workmen's Comp. App. Bd., supra,* 3 Cal.3d 312, 319; cf. *Wilhelm* v. *Workmen's Comp. App. Bd.* (1967) 255 Cal.App.2d 30, 33 [62 Cal.Rptr. 829]), it may not disregard such evidence as it has done in this case. Moreover, when as in this case the referee has relied upon the subject evidence to make a wholly supported finding of compensability, the Board may not avoid its obligation to give that finding great weight by ignoring the evidence on which it was based. In so doing, the Board in the instant case has rendered a decision which is not supported by substantial evidence in the light of the entire record.

The decision of the Board is annulled and the case is remanded to the Board for further proceedings consistent with the views expressed herein.

Wright, C. J., Tobriner, J., and Mosk, J., concurred.

**BURKE, J.**—I dissent, for a review of the record in this case establishes

---

[7]As indicated above, the Board in its first opinion on reconsideration was moved to observe that "stress and strain like beauty 'is in the eye of the beholder.'" While we are not qualified to dispute the aesthetic or epistimological validity of the dictum upon which the Board rests its analogy, we confess to some confusion as to the meaning sought to be conveyed thereby. If, as we suspect, the analogy seeks to express the idea that stress, like beauty, is a subjective sensation whose quality can be known only by the person experiencing it, we are all the more surprised that the Board did not accord great weight indeed to the evidence concerning decedent's subjective response to his employment.

[8]The dissenting opinion maintains that the subject evidence was not uncontradicted and unimpeached because the two doctors who testified on behalf of the employer stated in response to hypothetical questions that Lamb's employment was not emotionally stressful. It is important, however, to make a careful distinction between, on the one hand, evidence concerning the *inherent* qualities of the employment for causing stress, and, on the other hand, evidence concerning the *actual* effect of the employment upon the particular workman. While opinion evidence of the former variety might be of some probative weight in the determination of the ultimate issue —which, as we have explained, is the actual effect of the employment upon the particular workman—it can by no means be said to "contradict" or "impeach" eye-witness evidence which speaks directly to that issue.

beyond reasonable dispute that substantial evidence supported the board's finding that Lamb did not sustain an industrial injury.

The majority (p. 282) assert that the board failed to consider "the uncontradicted and unimpeached evidence" that Lamb's employment resulted in "considerable emotional stress" to him. To the contrary, a review of the record discloses evidence in the form of medical reports and testimony to the effect that Lamb suffered *no emotional stress whatever*. This evidence, which I summarize below, clearly constituted substantial evidence in support of the board's decision.

1. *Dr. Winsor*—Dr. Winsor reviewed Lamb's medical records and the reports of other doctors, which reports and records outlined the pertinent facts regarding Lamb's job and prior medical history. Both in his pretrial report and hearing testimony, Dr. Winsor insisted that no relationship existed between Lamb's employment and his heart condition. Counsel devised a hypothetical question which incorporated all the relevant testimony regarding Lamb's job (including its precision nature, the overtime required, Lamb's dislike for the job, and his "conscientious" attitude) and which inquired whether this employment was stressful, either physically *or emotionally*. Winsor responded that "I think this [employment] would not be stressful either physically or emotionally." With specific reference to Lamb's work, Winsor testified that he could not imagine an "easier" job, and that from a health standpoint, Lamb's work was neither "psychically" nor "physically" stressful.

2. *Dr. Markovitz*—Dr. Markovitz' report reviewed the facts surrounding Lamb's employment, medical history and subsequent death and concluded that death "was not caused, aggravated or accelerated by any work activities that he did at his place of employment." At the hearing, Markovitz testified that he did not consider Lamb's work to be "emotionally stressful." Counsel incorporated the essential facts surrounding Lamb's case into a hypothetical question, and then asked Markovitz "Was there anything in the history or medical reports, other information, that was incorporated in my hypothetical question that would lead you to believe that his [Lamb's] underlying diseases . . . were in any way aggravated or accelerated by his—the emotional phase of his job?" Markovitz responded, "No." He agreed that stress, emotional or physical, could be a factor contributing to heart disease, but he testified unambiguously that Lamb's employment situation was not stressful to him.

Given the foregoing evidence, I fail to understand how the majority are able to characterize petitioner's own evidence of emotional stress as

"undisputed," "uncontradicted" and "unimpeached." Possibly, the majority believe that petitioner's evidence was more credible than the testimony of Drs. Winsor and Markovitz which, as noted above, was based in part on their responses to hypothetical questions. Yet the weight to be given to the evidence is a matter for the board to determine, not this court.

As this court held in *Nielsen* v. *Industrial Acc. Com.*, 220 Cal. 118, 122-123 [29 P.2d 852], despite a lack of personal knowledge on their part, "The opinion of experts based on hypothetical statements of the facts in the record is competent evidence. The weight of such evidence is for the commission's determination." (Accord: *Foremost Dairies* v. *Industrial Acc. Com.*, 237 Cal.App.2d 560, 569-570 [47 Cal.Rptr. 173]; *Le Strange* v. *City of Berkeley,* 233 Cal.App.2d 276, 277-278 [43 Cal. Rptr. 455]; *Foster* v. *Industrial Acc. Com.*, 136 Cal.App.2d 812, 815 [289 P.2d 253].) These cases each expressly dispute the premise that the board must accept at face value the testimony of witnesses who purport to have personal knowledge of the facts, despite contrary opinions by medical experts in response to hypothetical questions. As I read the majority opinion, it overrules *sub silentio* the foregoing cases yet provides no justification whatever for doing so.

I conclude that there was ample substantial evidence to support the board's decision and, accordingly, I would affirm the decision.

McComb, J., and Clark, J., concurred.