[Civ. No. 34197. First Dist., Div. One. Dec. 2, 1974.]

SAM AMICO, Petitioner, v.
WORKMEN'S COMPENSATION APPEALS BOARD,
LEUNING CONSTRUCTION COMPANY et al., Respondents.

594

**COUNSEL**

Ted Akulian for Petitioner.

Barry J. Williams as Amicus Curiae on behalf of Petitioner.

T. Groezinger, James J. Vonk, George S. Bjornsen and Glenn W. Groene-wold for Respondents.

## OPINION

**SIMS, Acting P. J.**—In these proceedings petitioner seeks review of the decision after reconsideration of the Workmen's Compensation Appeals Board holding, contrary to the findings and award of the referee, that the award for petitioner's acknowledged permanent disability, rated at 45½ percent, should be reduced to 32 percent by apportioning 30 percent to the combined effects of surgery, necessitated by an injury in 1950 for which petitioner was compensated, and an alleged natural progression of a degenerative condition. Petitioner and amicus curiae on his behalf assert that since the applicant's uncontradicted testimony establishes that he had achieved complete rehabilitation from a prior injury, the board cannot, in the absence of qualified evidence to the contrary, order apportionment to the prior injury. The fundamental question is whether the decision of the appeals board is supported by substantial evidence. A review of the record indicates that it is not. The decision and award after reconsideration must be annulled.

I

On May 12, 1950, as the result of an industrial accident the petitioner, who was born February 4, 1921, and spent all of his adult life as a carpenter, suffered an injury to the lower back for which he received an award based on a permanent disability rating of 37¾ percent, together with an award for further medical treatment. From 1950 to 1955 he had problems with his back and though he worked from time to time he suffered pain and was in the hospital practically every year. As a result of an incident which occurred October 28, 1955, he was awarded temporary disability for an injury which aggravated his existing back condition. In 1956 he overcame his prior fear and accepted the recommendation of a laminectomy which was performed at the expense of the 1950 employer's insurer. After the operation he was off work for six months on order of the operating physician. He returned to work and engaged in general carpenter work for 15

years. He felt good after the operation and regretted he had not had surgery immediately after the first injury. He testified that between returning to work after the 1956 surgery and the subsequent injury of March 21, 1972, which is the subject of these proceedings, he suffered no disability, had no difficulty in getting work because of his previous back injury, and had no pain which made his work more difficult for him, and that although he lost time during that period because of rain and layoffs between jobs, he lost no time during that period as a result of the prior back injury.

At the hearing before the referee it was stipulated that the petitioner sustained a compensable injury to his back, right knee and a right hernia on March 21, 1972, during the course of his employment as a construction carpenter. The referee found that the injury resulted in permanent disability rated 45½ percent. After reviewing the reports of the three doctors who reviewed the petitioner's back condition, he disregarded the conclusions of two that apportionment should be made and made an award predicated on the full rating of existing disability.[1] The board in its decision after reconsideration concluded that the petitioner's rehabilitation was not complete, that 30 percent of his subsequent disability was attributable to the effects of the prior surgery and natural progression, and that the award should be reduced to that for a 32 percent disability rating.[2]

## II

The rules to be applied by this court in determining the propriety of the action of the appeals board recently have been collated in *Lamb* v.

---

[1] The decision after reconsideration of the appeals board refers to the referee's conclusions as follows: "The trial referee, impressed by the fact that applicant was rehabilitated from the first injury enough to do carpentry without losing time for 15 years before the second injury, concluded that his rehabilitation was complete and that there was no pre-existing disability to support an apportionment of the permanent disability. Not only is this reasoning contrary to the fact that applicant's ability to work was *probably* limited prior to the injury because of vulnerability and *perhaps* weakness from the first surgery, but it also disregards the natural progression of the disc disease apart from the effects of the injury."

[2] The same decision sets forth the board's conclusions as follows: "The Board is persuaded by the facts that applicant was found to have been permanently precluded from heavy lifting in 1951 and that he had major back surgery in 1956 and by the opinions of Dr. Cappeller and Dr. Miller that applicant would have at least 30 percent of his present work limitation even if he had not been reinjured in 1972. As Dr. Miller expressly pointed out, applicant's spine was vulnerable and perhaps somewhat unstable prior to March 21, 1972. This vulnerability *suggests* some limitation on his work ability even though he testified that he was able to work as a carpenter without difficulty. Dr. Cappeller, moreover, adds that there has been natural progression of pre-existing disc disease which he characterizes as 'widespread and extensive' and which is contributing to his present objective and subjective findings of disability. *Based on its experience in these matters,* the Board takes notice that, almost without exception, medical examiners impose work restrictions on post surgical backs." (Italics added.)

*Workmen's Comp. Appeals Bd.* (1974) 11 Cal.3d 274 [113 Cal.Rptr. 162, 520 P.2d 978], as follows: "*First.* 'Although the employee bears the burden of proving that his injury was sustained in the course of his employment, the established legislative policy is that the Workmen's Compensation Act must be liberally construed in the employee's favor (Lab. Code, § 3202), and all reasonable doubts as to whether an injury arose out of employment are to be resolved in favor of the employee. (*Lundberg* v. *Workmen's Comp. App. Bd.,* 69 Cal.2d 436, 439 . . .) *This rule is binding upon the board and this court. (Id.* at p. 439.)' (*Garza* v. *Workmen's Comp. App. Bd.* (1970) 3 Cal.3d 312, 317 . . .) (Italics added.)

■ "*Second.* '[A]lthough the board is empowered to resolve conflicts in the evidence [citations], to make its own credibility determinations [citations], and upon reconsideration to reject the findings of the referee and enter its own findings on the basis of its review of the record [citations], nevertheless, any award, order or decision of the board must be supported by substantial evidence *in the light of the entire record* (Lab. Code, § 5952; *LeVesque* v. *Workmen's Comp. App. Bd.,* 1 Cal.3d 627, 635 . . .)' (*Garza* v. *Workmen's Comp. App. Bd., supra,* 3 Cal.3d 312, 317.) (Italics added.) The foregoing standard is not met 'by simply isolating evidence which supports the board and ignoring other relevant facts of record which rebut or explain that evidence.' (*Id.* at p. 317.)

■ "*Third.* 'As a general rule, the board "*must accept as true the intended meaning of [evidence] both uncontradicted and unimpeached.*" (*LeVesque* v. *Workmen's Comp. App. Bd., supra,* 1 Cal.3d 627, 639; *McAllister* v. *Workmen's Comp. App. Bd., supra,* 69 Cal.2d 408, 413; see *Wilhelm* v. *Workmen's Comp. App. Bd., supra,* 255 Cal.App.2d 30, 33.)' (*Garza* v. *Workmen's Comp. App. Bd., supra,* 3 Cal.3d 312, 317-318.) (Italics added.)

■ "*Fourth.* When a referee's finding of compensable injury is supported by solid, credible evidence, it is to be accorded great weight by the Board and should be rejected only on the basis of contrary evidence of considerable substantiality. (*Garza* v. *Workmen's Comp. App. Bd., supra,* 3 Cal.3d 312, 318-319; *Greenberg* v. *Workmen's Comp. App. Bd.* (1974) 37 Cal.App.3d 792, 798-799 . . .)" (11 Cal.3d at pp. 280-281.)

Before examining the doctors' reports and other evidence in the light of the foregoing principles it is necessary to highlight the legal issues governing the question of apportionment.

### III

■ Section 4663 of the Labor Code provides: "In case of aggravation

of any disease existing prior to a compensable injury, compensation shall be allowed only for the proportion of the disability due to the aggravation of such prior disease which is reasonably attributed to the injury."

"It is settled that the section must be read in the light of the rule that an employer takes the employee as he finds him at the time of the employment. Accordingly, when a subsequent injury lights up or aggravates a previously existing condition resulting in disability, liability for the full disability without proration is imposed upon the employer, and the appeals board may apportion the disability under the section 'only in those cases in which part of the disability would have resulted, in the absence of the industrial injury, from the "normal progress" ' of the preexisting disease. [Citations.]" (*Ballard* v. *Workmen's Comp. App. Bd.* (1971) 3 Cal.3d 832, 837 [92 Cal.Rptr. 1, 478 P.2d 937]. See also *Granado* v. *Workmen's Comp. App. Bd.* (1968) 69 Cal.2d 399, 401 [71 Cal.Rptr. 678, 445 P.2d 294]; *Zemke* v. *Workmen's Comp. App. Bd.* (1968) 68 Cal.2d 794, 796 [69 Cal.Rptr. 88, 441 P.2d 928]; *Berry* v. *Workmen's Comp. App. Bd.* (1968) 68 Cal.2d 786, 789 [69 Cal.Rptr. 68, 441 P.2d 908]; *Redmond* v. *Workmen's Comp. Appeals Bd.* (1973) 36 Cal.App.3d 302, 307 [111 Cal.Rptr. 530]; *Fowler* v. *Workmen's Comp. Appeals Bd.* (1972) 22 Cal.App.3d 756, 760 [99 Cal.Rptr. 609]; *Skinner* v. *Workmen's Comp. App. Bd.* (1969) 269 Cal.App.2d 905, 908-909 [75 Cal.Rptr. 314]; *Spillane* v. *Workmen's Comp. App. Bd.* (1969) 269 Cal.App.2d 346, 350 [74 Cal.Rptr. 671]; and *Pacific Employers Ins. Group* v. *Workmen's Comp. App. Bd.* (1966) 247 Cal.App.2d 102, 108-109 [55 Cal.Rptr. 176].)

As has been noted the petitioner testified that he was completely asymptomatic between the time he returned to work following the 1956 operation and his injury in 1972. The referee accepted this testimony and found there was no preexisting disability to apportion. The only evidence tending to contradict the testimony of the petitioner are statements in Dr. Cappeller's reports in which he indicates that the defendant gave a history of occasional loss of time from work.[3] In this connection the petitioner testified that Dr.

---

[3]In his first report, an examination November 8, 1972, Dr. Cappeller reported, "The actual history, as I get it from the patient, is that he was injured in 1950. He went on working for about five years with pain. He was occasionally off work, he was occasionally hospitalized for traction. He finally had a laminectomy. He did very well for 16 years, though with occasional mild discomfort and *occasional loss of time from work.*" (Italics added.) He concluded in reference to the 1956 surgery, "This was quite a successful operation in relieving pain for a period of 16 years, though there was some back and left leg discomfort and occasional time off work, hence he was not totally recovered."

A second report made after a review of medical reports and files, without reexamination of petitioner, on May 15, 1973, states: "The history I obtained from Mr. Amico indicates that he was never symptom-free following this original laminectomy. Rather

Cappeller had asked him if he had lost any time from work between surgery in 1956 and the 1972 injury, but that he had not asked him the reasons for his loss of time, which, in fact, was not the result of his prior back injury. There was no attempt to clear up this discrepancy by further examination of Dr. Cappeller. Dr. Miller, who, as an independent medical examiner appointed by the referee, examined the petitioner after he had testified, reports a history in which the petitioner recited, "He states that then for 15 or 16 years after that recovery, he worked doing all sorts of heavy work in the carpentry line and had insufficient trouble with his back or leg to have to miss any work." The referee in his original report and in his report on the carrier's petition for reconsideration accepted the petitioner's testimony. In the latter he stated, "The uncontroverted testimony of applicant was that he did not lose any time from work for the 15-year period before the second injury by reason of back disability." The appeals board decision after reconsideration recites, "In August of 1956 it was found that applicant was still in need of further medical treatment for his back." The reference must be to the surgery performed that year and the ensuing six months period of recuperation. The board noted the petitioner's testimony that he suffered no loss of time by reason of his back for 15 years. It then proceeded to disregard that uncontradicted testimony (cf. *Lamb* v. *Workmen's Comp. Appeals Bd., supra,* 11 Cal.3d 274, 281; *Garza* v. *Workmen's Comp. App. Bd.* (1970) 3 Cal.3d 312, 317-318 [90 Cal.Rptr. 355, 475 P.2d 451]; and *LeVesque* v. *Workmen's Comp. App. Bd.* (1970) 1 Cal.3d 627, 639 [83 Cal.Rptr. 208, 463 P.2d 432]), and the findings of the referee based thereon (cf. *Lamb* v. *Workmen's Comp. Appeals Bd., supra,* 11 Cal.3d 274, 281; *Garza* v. *Workmen's Comp. App. Bd., supra,* 3 Cal.3d 312, 318-319). The board turned to the doctors' reports for contrary evidence which would support its acknowledged right to make a factual determination contrary to that of the referee. (See *Nat. Auto. & Cas. Co.* v. *Ind. Acc. Com.* (1949) 34 Cal.2d 20, 28-30 [206 P.2d 841].) The question is whether those reports have "contrary evidence of considerable substantiality." (See *Lamb* v. *Workmen's Comp. Appeals Bd., supra,* 11 Cal.3d 274, 281.)

Under date of March 30, 1972, the physician who was to operate on the petitioner, expressed the following impression on the basis of X-rays[4]

---

he had occasional mild discomfort and occasionally sufficient pain to lose time from work. Hence, he was not totally asymptomatic at the time of his injury on March 21, 1972." It further recites: "The factual information would appear to be, according to the patient, that he indeed did have a good but not perfect result after his first laminectomy. He did have residual symptoms, to the point of occasionally losing time from work."

[4]These X-rays were later referred to by Dr. Cappeller as follows: *"Lumbar Spine* dated 3-30-72—There are five lumbar bodies. Sacroiliac joints are not remarkable. No

and a physical examination of the petitioner, "Degenerative lumbar disc disease most likely at the L-3, L-4 on the basis of knee jerk movement." Petitioner was admitted to the hospital April 12, 1972, at which time the same doctor revised his impression to read: "Herniated lumbar disc disease, most likely at the L3, L4, or L4-L5." An X-ray report dated April 13, 1972, ended, "Degenerative disc disease, moderately advanced at L2, 3 and L5, S1 levels."[5] A report of a myelogram April 14, 1972, concludes: "Symmetrical narrowing at L4, 5."[6] The report of the operation on April 17, 1972, discloses that a large soft bulging disc was noticed between the L4-L5 intervertebral disc space, and that the soft disc material was removed. This doctor made periodic reports culminating with a form report dated September 11, 1972, which indicated that the petitioner was suffering lumbar disc disease and would require office followup as needed and that he could return to work approximately October 2, 1972. A letter dated the following date concludes, ". . . perhaps due to his age and back operation, he should avoid doing work that involves heavy lifting. I think he is able to return to work provided he avoids heavy lifting or extremely strenuous job." This doctor never expressed any opinion on the question of the degree of the petitioner's disability, if any, immediately prior to the accident of March 21, 1972.

Petitioner filed his application for permanent disability indemnity, reimbursement for medical expense and future medical treatment on August 23, 1972. On November 8, 1972, the records and X-rays were reviewed and petitioner was examined by Dr. Cappeller. The doctor took further X-rays and reported as follows: "Bony density is normal. Sacroiliac joints are clear. No isthmus defect is seen. There is evidence of laminectomy at the L4-5 level. There is extensive disc degeneration at the L4-5 disc space and also at the L2-3 disc space, with considerable marginal proliferation. There is slight narrowing of the L4-5 disc space, comparable to that seen

---

isthmus defect is seen. There is marked narrowing of several discs spaces. There is marked narrowing of the lumbosacral disc space. There is also marked narrowing of the disc space between L-2 and L-3, both with considerable anterior marginal proliferation."

[5]The body of the report reads: "LUMBO-SACRAL SPINE: Including both oblique views and AP pelvis reversal degenerative disc disease at L2, 3 as well as L5, S1 levels with narrowing of the interspace, sclerosis of the articular margins, as well as hypertrophic osteoarthritic spurring, both anteriorly and posteriorly at both levels. The remainder of the vertebral bodies, interspaces, pedicles and posterior elements are unremarkable. Sacroiliac and hip joints are normal."

[6]The body of the report reads: "LUMBAR MYELOGRAM: With 9 cc. of Pantopaque injected through a L3, 4 lumbar puncture reveals bilateral symmetrical narrowing at L4, 5 level with slight defect seen on the lateral across the table film also. The remainder of the interspaces are unremarkable myleographically. The patient has degenerative disc disease at the L2, 3 and L5, S1 seen on plain films."

in films dated 3-30-72. There does not appear to be any change in the lumbar spine films subsequent to that date other than for the laminectomy defect." After noting that there was left leg discomfort and occasional time off work after the first operation (see fn. 3 above and accompanying text), the carrier's doctor noted the accident, the degenerative changes revealed by the post-accident X-rays,[7] and concluded: "He now has low back pain from extensive degenerative disc disease and two laminectomies. He has bilateral leg pain of non-sciatic type, but rather referred pain from degenerative disc disease of the lumbar spine. [¶] In addition to the back problems he has some residual symptoms relative to the right knee, though x-ray examination, arthrography, and clinical examination are normal and do not account for these subjective complaints. [¶] He has residual complaints from a hernioplasty done for right inguinal hernia, presumably related to the injury of March of this year. These complaints are significant. The patient states that the surgeon involved was considering re-operation. Such information is not in the medical record." He concluded, "It would be my opinion that there is a pre-existing back problem consisting of multiple areas of disc degeneration, one of which has given him trouble in the past, with left leg pain however. Nevertheless, this pre-existing degenerative disease is in part responsible for his present complaints, particularly since there was some degree of symptomatology over the 16 year period prior to March of 1972. The injury of March, 1972 certainly aggravated the situation, producing a right sciatica and right inguinal hernia. [¶] As far as his back is concerned, I feel that he is disabled from the strenuous occupational activities of a carpenter and excessive lifting. I would apportion 60% of his present back disability to the injury of March of this year and 40% to pre-existing factors."

On December 30, 1972, petitioner was examined by Dr. McIvor who was selected by petitioner's attorney. He reported the following past his-

---

[7]This part of the November 8 report reads: "He then had an injury in March of 1972. X-rays on that date showed degenerative changes between L-2 and L-3 and between L-4 and L-5, and at the L5-S1 level. As a result of this injury he had back and right leg pain. There was also presumably an injury to the right knee, and he developed a hernia in the right inguinal region. He had a second laminectomy shortly after this injury. He has not done as well post-operatively as after his first operation and has not returned to work, yet he states that he is probably no worse now than he was during the five year period that he worked between the injury of 1950 and the laminectomy of 1955. [¶] *It is impossible to tell in any of the back x-rays, even those of March of this year, when degenerative changes started.* I do not know at what level his initial laminectomy was done. It obviously was, however, for a disc protrusion on the opposite side. Certainly some of the degenerative changes were of exceedingly long-standing. [¶] At the present time there is no clinical evidence of further disc protrusion or nerve root involvement. He does have a depressed left Achilles reflex, which presumably has been present prior to his first laminectomy, which may have been at the L5-S1 level on the left." (Italics added.)

tory: "Injured his back in 1950. This was an on the job injury. He was frightened of surgery and put it off for some five or six years; eventually, one of his legs went numb and he was treated by Dr. Van Horn with a disc removal. After six months he felt fine and was able to work actively as a carpenter thereafter. Other surgeries include hemorrhoidectomy. Fractures, none. He dislocated his left shoulder on one occasion." In his discussion the doctor noted, "This man, in addition to his ruptured disc, has marked areas of disc degeneration at L5-S1 and L2-3. The ruptured disc was at L4-5. This combines to make his back very vulnerable to stresses and strains. I would think that in the future he is going to be limited to light work." He concluded, "I would think that the work limitations are a direct result of the injury in question since he was actively working up until that time, in spite of having had a previous lumbar laminectomy."

Thereafter on March 15, 1972, Dr. Cappeller reviewed the records including Dr. McIvor's report. As indicated above (fn. 3), this doctor persisted in the premise that the petitioner was never symptom free following the 1956 operation necessitated by the 1950 injury. Without any explanation, and in contradiction of his original statement that it was impossible to tell when the degenerative changes started (see fn. 7 above), the doctor stated: "He had pre-existing degenerative disc disease of very significant extent prior to his first laminectomy, and prior to his second injury and second laminectomy. These degenerative changes in his back indeed play some significant role in his total present subjective factors." He also brought in a new factor, a retroactive diagnosis of a prophylactic restriction following the first injury and operation, when he stated, on the basis of his interpretation of the patient's history (see fn. 3 above), "It would therefore appear to me that a rating subsequent to his first laminectomy should include restriction from very heavy lifting since heavy lifting was productive of symptoms and loss of work subsequent to his first laminectomy."

Dr. Cappeller's conclusion, which the appeals board quoted and relied upon in its opinion, read as follows: "Therefore, in my opinion there are four factors that have to do with any residual subjective complaints or objective findings at the present time. Firstly, there is the pre-existing and naturally-progressing degenerative disc changes which are rather widespread and extensive in his lumbar spine. Secondly, there is his first injury and laminectomy, from which he made a good but incomplete recovery. Thirdly, there is the injury of March 21, 1972, and fourthly the laminectomy that followed that particular injury. [¶] It is for these reasons that I feel that the injury of March, 1972 only aggravated the pre-existing situation and feel that apportionment should be made attributing 60° [*sic* "%'] of the back problem to the injury of March, 1972 and 40% to the pre-existing factors mentioned."

Following the hearing the referee referred the petitioner to Dr. Miller of the medical bureau as an independent examiner. He accepted the petitioner's history of recovery and activity for 15 to 16 years. Nevertheless, his conclusions, upon which the appeals board also relied, read as follows: "From the present examination, there are findings of residual disability and symptoms credible to the degree as noted below. It is the further opinion that the first laminectomy in 1956 did contribute to back instability, leaving it somewhat more vulnerable and therefore it is felt reasonable to apportion 30% of his present disability to his condition prior to March 21, 1972 and 70% to the injury occurring on that date and to its necessary subsequent surgery."

■ The rules for evaluating the probative effect of expert medical opinions are set forth in *Place* v. *Workmen's Comp. App. Bd.* (1970) 3 Cal.3d 372 [90 Cal.Rptr. 424, 475 P.2d 656], as follows: "Expert medical opinion, however, does not always constitute substantial evidence on which the board may rest its decision. Courts have held that the board may not rely on medical reports which it knows to be erroneous [citation], upon reports which are no longer germane [citations], or upon reports based upon inadequate medical history or examinations [citations]. In *Zemke* v. *Workmen's Comp. App. Bd.* (1968) 68 Cal.2d 794, 798 . . . , we held that 'an expert's opinion which does not rest upon relevant facts or which assumes an incorrect legal theory cannot constitute substantial evidence. . . .'

"An expert opinion is also insufficient to support a board determination when the opinion is based on surmise, speculation, conjecture, or guess. [Citations.]" (3 Cal.3d at p. 378. In addition to the quoted case, see *Hegglin* v. *Workmen's Comp. App. Bd.* (1971) 4 Cal.3d 162, 169-170 [93 Cal.Rptr. 15, 480 P.2d 967]; *Ballard* v. *Workmen's Comp. App. Bd.*, *supra*, 3 Cal.3d 832, 839; *Granado* v. *Workmen's Comp. App. Bd.*, *supra*, 69 Cal.2d 399, 406-407; *Berry* v. *Workmen's Comp. App. Bd.*, *supra*, 68 Cal.2d 786, 791; *Redmond* v. *Workmen's Comp. Appeals Bd.*, *supra*, 36 Cal.App.3d 302, 308; *Fowler* v. *Workmen's Comp. Appeals Bd.*, *supra*, 22 Cal.App.3d 756, 760; *Avila* v. *Workmen's Comp. App. Bd.* (1970) 14 Cal.App.3d 33, 37-38 [91 Cal.Rptr. 853]; and *Spillane* v. *Workmen's Comp. App. Bd.*, *supra*, 269 Cal.App.2d 346, 351.) "Opinions based upon assumptions in conflict with the established rules for apportionment cannot be utilized to uphold the board's findings." (*Berry* v. *Workmen's Comp. App. Bd.*, *supra*, 68 Cal.2d at p. 791.)

■ Inherent in the opinions of the appeals board and the opinions of the doctors upon whom it relies is the concept that on March 21, 1972,

at the time of the accident the petitioner was disabled to an ascertainable extent because of the then existing condition of his back. ■ "A permanent disability is one '. . . which causes impairment of earning capacity, impairment of the normal use of a member, or a competitive handicap in the open labor market.' (2 Hanna, Employee Injuries and Workmen's Compensation (1954) p. 255. See Lab. Code, § 4660, subd. (a).)" (*State Compensation Ins. Fund* v. *Industrial Acc. Com.* [*Hutchinson*] (1963) 59 Cal.2d 45, 52. See also *Avila* v. *Workmen's Comp. App. Bd.*, *supra*, 14 Cal.App.3d 33, 37.) ■ In this case there is no evidence to show that for the 15 years antedating the 1972 injury the petitioner's earning capacity or normal use of his body or limbs was in any way impaired or that he suffered any competitive handicap in the open labor market for heavy duty carpenters. On this state of the evidence the disability resulting from any progressive degenerative disease of his spine which was asymptomatic prior to the industrial injury is governed by the rule enunciated in *Ballard* v. *Workmen's Comp. App. Bd.*, *supra*, 3 Cal. 3d 832, 837, and applied in numerous cases. ■ " 'Industry takes the employee as it finds him. A person suffering from a pre-existing disease who is disabled by an injury proximately arising out of the employment is entitled to compensation even though a normal man would not have been adversely affected by the event.' (*Liberty Mut. Ins. Co.* v. *Ind. Acc. Com.* (1946) 73 Cal.App.2d 555, 559 . . . [other citations omitted].)" (*Lamb* v. *Workmen's Comp. Appeals Bd.*, *supra*, 11 Cal.3d 274, 282. See also *Zemke* v. *Workmen's Comp. App. Bd.*, *supra*, 68 Cal.2d 794, 799-800; *Berry* v. *Workmen's Comp. App. Bd.*, *supra*, 68 Cal.2d 786, 790-791; *Redmond* v. *Workmen's Comp. Appeals Bd.*, *supra*, 36 Cal.App.3d 302, 307; *Fowler* v. *Workmen's Comp. Appeals Bd.*, *supra*, 22 Cal.App. 3d 756, 761; *Spillane* v. *Workmen's Comp. App. Bd.*, *supra*, 269 Cal. App.2d 346, 349-350; *Jones* v. *Workmen's Comp. App. Bd.* (1968) 267 Cal.App.2d 302, 305 [72 Cal.Rptr. 766]; *Pacific Employers Ins. Group* v. *Workmen's Comp. App. Bd.*, *supra*, 247 Cal.App.2d 102, 107; and *Liberty Mut. Ins. Co.* v. *Ind. Acc. Com.* (1946) 73 Cal.App.2d 555, 558-559 [166 P.2d 908].)

■ The alleged vulnerability to further injury because of the 1956 laminectomy fails to furnish a ground for apportionment for the same reason. There is no evidence that it interfered with the petitioner's employment in his chosen trade or his ability to carry on the duties of that trade without impairment from any pain, weakness or limited endurance during the 15-year interval between his first operation and the industrial injury in 1972. It should be remembered that the purpose of workmen's compensation insurance is to spread the cost of industrial injury as an integral

cost of the product of the workman's labor. Here for over 15 years the petitioner rendered a full day's work for presumably a full day's pay, and presumably full premiums were paid for workmen's compensation insurance on the basis of his wages. The fact that this applicant made a better recovery than he had a right to expect from his first operation should not place him in a position inferior to that of a fellow worker whose industrially caused disability is compounded by the existence of a pathological condition which was previously asymptomatic.

In support of the appeals board's decision it is urged, as recited therein (see fn. 2 above), that there should have been a prophylactic work restriction on the petitioner's activities after his first operation, and that such restriction constituted a preexisting disability supporting the apportionment. There is nothing in the history or the reports to show that such a restriction was in fact imposed. The suggestion by Drs. Cappeller and Miller that they would have imposed such a restriction, falls within the criteria of that medical opinion which is denigrated in *Place* v. *Workmen's Comp. App. Bd., supra,* 3 Cal.3d 372, 378, and related cases. Insofar as the appeals board attempts to draw on its own experience to establish as a fact that which can be but surmise or conjecture, there is no substantiality to the evidence. In *Garza* v. *Workmen's Comp. App. Bd., supra,* the court observed, "An award based solely upon conjectural evidence cannot be sustained. [Citation.] Similarly, the denial of compensation benefits cannot rest upon the board's mere suspicion or surmise, in view of the policy of the law to resolve all reasonable doubts in the employee's favor." (3 Cal.3d at p. 319. See also *Adams* v. *Workmen's Comp. Appeals Bd.* (1971) 22 Cal.App.3d 214, 217 [99 Cal.Rptr. 269].)

It is true that for the purpose of determining prospective temporary or permanent disability the board must take into account the loss of earning power from any prophylactic restriction on the employee's activities. (See *Dalen* v. *Workmen's Comp. Appeals Bd.* (1972) 26 Cal.App.3d 497, 507 [103 Cal.Rptr. 128]; *Adams* v. *Workmen's Comp. Appeals Bd., supra,* 22 Cal.App.3d at p. 217; and *Luchini* v. *Workmen's Comp. App. Bd.* (1970) 7 Cal.App.3d 141, 145 [86 Cal.Rptr. 453]. Cf. *Jones* v. *Workmen's Comp. App. Bd., supra,* 267 Cal.App.2d 302, 305.) This principle, however, cannot be applied in this case in the absence of evidence to show that petitioner was actually so restricted by medical advice received when he was discharged following the recuperative period after his first operation.

In short, there is no substantial evidence to support an apportionment under the provisions of section 4663.

## IV

Section 4750 provides as follows: "An employee who is suffering from a previous permanent disability or physical impairment and sustains permanent injury thereafter shall not receive from the employer compensation for the later injury in excess of the compensation allowed for such injury when considered by itself and not in conjunction with or in relation to the previous disability or impairment. [¶] The employer shall not be liable for compensation to such an employee for the combined disability, but only for that portion due to the later injury as though no prior disability or impairment had existed."

This section is found in the provisions of the Labor Code dealing with payments for subsequent injuries. The carrier insists that there is a well recognized distinction between the situation when, as here, there are successive industrial injuries, and the situation contemplated by section 4663 when there is aggravation of a disabling preexisting disease. (See *Hegglin* v. *Workmen's Comp. App. Bd.*, *supra*, 4 Cal.3d 162, 173; *Granado* v. *Workmen's Comp. App. Bd.*, *supra*, 69 Cal.2d 399, 403; *State Compensation Ins. Fund* v. *Industrial Acc. Com.* [*Hutchinson*], *supra*, 59 Cal.2d 45, 54-56; *Subsequent Injuries Fund* v. *Workmen's Comp. Appeals Bd.* (1974) 40 Cal.App.3d 403, 410 [115 Cal.Rptr. 204]; and *Argonaut Ins. Co.* v. *Workmen's Comp. App. Bd.* (1971) 15 Cal.App.3d 436, 439 [93 Cal.Rptr. 65].) In *Granado* v. *Workmen's Comp. App. Bd.*, *supra*, the court observed, "There is a substantial difference between the rules governing apportionment between industrial injuries and those governing apportionment between industrial and nonindustrial injuries." (69 Cal.2d at p. 402.)

"The purpose of this statutory provision is to encourage the employment of physically disabled persons by assuring an employer that he will not be liable for the total combined disability present after an industrial injury, but only for that portion which is attributable to the subsequent industrial injury. [Citation.]" (*State Compensation Ins. Fund* v. *Industrial Acc. Com.* [*Hutchinson*], *supra*, 59 Cal.2d 45, 49. See also *Pacific Gas & Elec. Co.* v. *Ind. Acc. Com.* (1954) 126 Cal.App.2d 554, 557-558 [272 P.2d 818].) The purpose of the statute is served when a person who is in fact partially permanently disabled is employed. When such person suffers a subsequent injury, it is proper to relieve the employer of liability for that portion of the disability which antedated the second injury. (See *Subsequent Injuries Fund* v. *Workmen's Comp. Appeals Bd.*, *supra*, 40 Cal.App.3d 403, 409-410; and *Argonaut Ins. Co.* v. *Workmen's Comp. App. Bd.*, *supra*, 15 Cal.App.3d 436, 439.) In the latter case it is recognized "that rehabilitation is an important objective of the statutory

scheme for workmen's compensation, and, if an injured employee recovers and thereafter is again injured, he is entitled to compensation for the injury to his rehabilitated condition, not limited in amount by the terms of a former award. (*National Auto & Cas. Ins. Co.* v. *Industrial Acc. Com.,* 216 Cal.App.2d 204. . . ; *Pacific Gas & Elec. Co.* v. *Industrial Acc. Com.,* 126 Cal.App.2d 554 . . .)" (15 Cal.App.3d at p. 439. See also *Avila* v. *Workmen's Comp. App. Bd.* (1970) 14 Cal.App. 3d 33, 37-38 [91 Cal.Rptr. 853].) The cases last referred to demonstrate that it is the actual preexisting permanent disability at the time of the subsequent injury which governs, not some rating that may have been awarded many years before.

In *Pacific Gas & Elec. Co.* v. *Ind. Acc. Com.* (1954) 126 Cal.App.2d 554 [272 P.2d 818], the court pointed out, "In the instant case the employee received a rating of 25½ percent permanent disability in 1942 entitling him to compensation for 102 weeks thereafter. When the 102 weeks had expired some time in 1944 the employee received no further compensation for the 1940 injury. It must be assumed that the employee was then fully compensated for the loss of earning power suffered in that accident. The theory of permanent disability rating, according to Campbell, is that the employee will be able to rehabilitate and readjust himself to his new earning capacity within an average period, and the ratings are computed so as to provide disability during that estimated period. [Citation.] Petitioner's interpretation of permanent disability on the other hand, is that the injured workman can never be rehabilitated beyond the point when the permanent rating is made. It is contended that the employee herein must forever after in any proceedings be considered 25½ percent permanently disabled, and have therefore only a potential possibility of 74½ percent disability, even though conceivably he might sustain later injury conclusively presumed to be 100 percent under section 4662, Labor Code. . . . [¶] The legislation providing for the Subsequent Injuries Fund has been enacted with a view toward encouraging employment of handicapped persons, and if that fund occasionally is resorted to for payment of compensation of a worker more than 70 percent permanently disabled from a combination of industrial injury and prior impairment or injury, such a legislative policy appears to be wiser and more economical than one which would discourage industry from employing handicapped workers no matter how skilled they might be. It cannot be contemplated that such policy will discriminate against an injured worker and in favor of industry. In this type of case the employer would have to pay 77 percent permanent disability for this one injury to a worker who had not previously been injured, but would pay less to a worker who had some

prior though unrelated handicap under petitioner's theory." (126 Cal.App. 2d at pp. 557-558.)

So here under the provisions of section 4750, as well as under the provisions of section 4663, it is the actual disability at the time of the subsequent injury which governs. The earlier rating of 37¾ percent for the 1950 injury is not res adjudicata with respect to the petitioner's condition when he sustained the subsequent injury in 1972. (*Pacific Gas & Elec. Co.* v. *Ind. Acc. Com., supra,* 126 Cal.App.2d 554, 559. See also *National Auto & Cas. Ins. Co.* v. *Industrial Acc. Com.* (1963) 216 Cal.App.2d 204, 207 and 212 [30 Cal.Rptr. 685].) As has been demonstrated above (part II) the appeals board's finding in the decision after reconsideration is not based on substantial evidence in the light of the entire record, but on a "'guesstimate.'" (See *Avila* v. *Workmen's Comp. App. Bd., supra,* 14 Cal. App.3d at p. 38.)

The award is annulled and the case is remanded to the Workmen's Compensation Appeals Board for further proceedings consistent with this opinion.

Elkington, J., and Bray, J.,* concurred.

---

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.