[Civ. No. 25001.   First Dist., Div. Four.   May 7, 1968.]

AGNES M. BINGHAM et al., Petitioners, v. WORKMEN'S COMPENSATION APPEALS BOARD, CALIFORNIA INSPECTION RATING BUREAU et al., Respondents.

Thomas M. Mulvihill for Petitioners.

Everett A. Corten, Selma Mikels, Robert C. Taylor, Edward L. Beggs, James A. Gaughran, Sedgwick, Detert, Moran & Arnold and Michael W. Laughlin for Respondents.

CHRISTIAN, J.—Petitioners, the widow and minor children of John D. Bingham, seek review and annulment of a decision by the Workmen's Compensation Appeals Board that Bingham's death was not the result of injuries arising out of and occurring in the course of his dual employment with respondents California Inspection Rating Bureau and Macy's of California.

Decedent had been employed by the California Inspection Rating Bureau (hereafter Bureau) since 1952, and at the time of his death was a senior field auditor. His job was to audit payroll records of all types of businesses, in a territory extending from Bakersfield to Red Bluff and Ukiah, in connection with computation of premiums for workmen's compensation insurance. In the course of his employment decedent did a great deal of driving; this tended to upset and exhaust him, and he got so he "hated it." He also disliked the aspects of his job which caused him to be away from home frequently while making field audits. Decedent was often exposed to harassment and delay from certain employers who resisted the auditing of their books. He was required to rearrange his schedule in order to locate missing books and ledgers, and sometimes got behind in his assignments. When delays occurred decedent felt he had to "race" to make up for his lost time. The employer furnished decedent with an adding machine so that he could catch up on his audits at home. Decedent met all of these pressures and strains with determination, and his supervisor praised his work highly.

In 1954 decedent, with the knowledge of the first employer, took a second job as a salesman in the liquor department at Macy's Hillsdale store. The job was taken in order to produce supplementary income after the birth of a third child, and because of a continuing inability to meet rising household expenses. Bingham worked Friday evenings, all day Saturdays, and frequently on Monday and Thursday nights. In

addition to selling, he was required to receive and handle cases of liquor. This work included lifting, stacking and unstacking from two to fifty cases a day, depending on the store's needs. The cases weighed about fifty pounds each, and there was evidence that during sales decedent sometimes had to strain to work faster so that he could stack cases and wait on customers during the same work period. Decedent's hard-working and conscientious performance earned him recognition as "Salesman of the Year" at Macy's; fellow employees described him as an "excellent worker."

On October 1, 1964, after working all day on his audits for the Bureau, decedent had dinner, and then left for his job at Macy's. Later he returned home feeling "awfully sick," and immediately went to bed. During the night he awakened his wife and asked her to call a doctor. Dr. Stanley Hanfling arrived, found decedent "acutely ill, cold, cyanotic, clammy" and hospitalized him. Decedent complained of sharp pains in his chest which radiated down both arms. Dr. Hanfling at first believed decedent's condition might be caused by a diseased gall bladder or peptic ulcers; later he diagnosed the condition as a myocardial infarct occurring at 4 a.m. on October 2. Decedent remained in the hospital until his death on October 24, 1964. The death certificate, signed by Dr. Hanfling, stated the cause of death to be "shock (2 hrs.), due to acute myocardial infarction (3 wks.), due to Arteriosclerotic heart disease (3 months)."

Medical records received at the referee's hearing established that decedent had been under the care of a Dr. Stitch three years before the fatal attack and that Dr. Stitch had diagnosed hypertension. A report prepared by decedent's family physician indicated that decedent had suffered pains the year before which might have been signs of a coronary attack.

Dr. Elise M. Rose, who had been retained by applicants for purposes of testimony, stated in a report received in evidence by the referee that decedent "carried a heavy work load; tension was present in his job with the . . . Bureau; physical effort was present in his job at Macy's. This man pushed himself beyond the point where his cardiovascular system could take further insults." Dr. Rose concluded that decedent's jobs had aggravated the underlying coronary heart disease and caused his death.

Dr. Hanfling, the physician who treated decedent during his last illness, testified that ulcers are common in hard striv-

ing people and "play the same role as does heart disease, and . . . stress may aggravate either condition." He stated that in his opinion heart disease was inherited and that decedent's disease was inherited. Cardiograms taken of decedent showed evidence of "an old injury to the heart." Dr. Hanfling concluded that he did not believe that decedent's heart attack was "industrial."

Another physician, Dr. Eliaser, was retained by the Bureau's insurance carrier for purposes of testimony. In his opinion, "there was no relationship between the work and the time of infarction . . . the time interval between the performance of work and the infarct is too great to be industrial."

The referee found that Bingham died as a proximate result of injuries arising out of and occurring in the course of his employment by Macy's, and the Bureau, and awarded $20,500 in death benefits. The appeals board granted reconsideration and, under Labor Code section 5703, subdivision (b), appointed Dr. Meyer Friedman to act as independent medical examiner, review the file, and respond to the following questions: "1. In your opinion, what was the medical cause of decedent's death? 2. Was decedent's death caused by his employment? 3. If the Examiner feels that decedent's employment caused his heart condition, to what period of time is he referring? 4. If the injury industrially caused, what apportionment, if any, among the two employers?" Dr. Friedman expressed in his report sharp disagreement with what he termed Dr. Eliaser's persistent refusal "to accept the increasing evidence that is now in the medical literature of the relationship of stress and strain to coronary heart disease." He then went on to give the following answer to the question whether Bingham's death was caused by his employment: "I might say that any type of employment that was performed by this man in the way he did it would have been partially responsible for his development of coronary artery disease and the accidents that are associated with this disease. *The real cause of his death was his continuous drive to hold down two positions without adequate rest for himself.* [Italics added.] This in part, as I have already stated, was due to the kind of personality he had that impelled him to continuously drive for status enhancement. Put it in another way, the same sort of drive that allowed him to be considered the salesman of the year by Macy's is the drive that enhanced his coronary heart disease. So either type of employment served as tinder to the flame of his drive. His employment in two jobs did not

produce his documented restlessness but rather his restlessness sought two jobs and I haven't much doubt that if a third type of employment had been offered to him, he would possibly have found a way to take on a third responsibility.

"    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"I would say that I don't believe that this is an industrial injury. This man himself took on the two jobs and I think that he must be considered responsible for his coronary artery disease and not the employers. However, if my opinion is not considered true in regard to the nonliability of employment for his heart disease, and if employment is considered absolutely responsible for his illness then I would say both employers are equally at fault. But I would like once more to stress that neither type of employment that he had, as I see it described in the file, carried in itself any legitimate cause for hastening of the coronary atherosclerotic process."

After filing Dr. Friedman's report, the appeals board prepared and filed an "Opinion, Order and Decision After Reconsideration" denying benefits. The opinion declared that the board's conclusion was "based upon the report of Dr. Friedman, that the deceased employee's heart attack did not arise out of and occur in the course of his employment." Petitioners contend that the board's decision is not supported by substantial evidence.

Whether an employee's work contributed to his injury is a question of fact for the determination of the appeals board. (*Argonaut Ins. Co.* v. *Industrial Acc. Com.* (1964) 231 Cal.App.2d 111, 115 [41 Cal.Rptr. 628].) "When a finding of fact . . . is attacked . . . the power of an appellate court *begins* and *ends* with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the finding of fact." (*Douglas Aircraft, Inc.* v. *Industrial Acc. Com.* (1957) 47 Cal.2d 903, 905 [306 P.2d 425].) "Where there is substantial evidence to support the findings and order of the commission, the reviewing court may not substitute its views for those of the commission and annul the award. . . . If the findings . . . are supported by inferences which may fairly be drawn from evidence, even though the evidence is susceptible of opposing inferences the reviewing court will not disturb the award." (*Pacific Lbr. Co.* v. *Industrial Acc. Com.* (1943) 22 Cal.2d 410, 422-423 [139 P.2d 892].)

It is true that there were conflicts in the medical evidence: for example, evidence that Bingham's fatal coronary attack

was hastened by the long continuing pressure of two demanding jobs was directly contradicted by Dr. Eliaser's opinion denying the existence of a causal relationship between stress and coronary heart disease. But the board's award did not represent a resolution of such conflicts in the evidence; it was expressly and exclusively founded upon Dr. Friedman's report which we have just reviewed.[1] From that report the board concluded that Bingham's stress was not the result of his employment but "of the personality that he took to the job."

Petitioners contend, in effect, that instead of responding directly to the board's inquiry whether Bingham's death was caused by his employment Dr. Friedman gave an erroneous legal opinion: "This man himself took on the two jobs and I think that he must be considered responsible for his coronary artery disease and not the employers." We are persuaded by petitioners' contention. ▮ Entitlement to workmen's compensation benefits is not defeated by a showing of negligence or bad judgment on the part of the employee. (Lab. Code, § 3600; *Associated Indem. Corp.* v. *Industrial Acc. Com.* (1941) 18 Cal.2d 40, 44, 46-47 [112 P.2d 615].) Several passages in Dr. Friedman's report imply his opinion that the long hours Bingham worked under stress did play a part in causing the fatal attack but that Bingham's work should be absolved as a causative factor because if he did not have these two jobs he would have had some other and, given his personality, would have driven himself unreasonably in any employment setting. Dr. Friedman's analysis of causation is inappropriate in a workmen's compensation proceeding. Not all jobs are as stressful as the two held by Bingham. Moreover, had Bingham been physically disabled he could not have held either of these jobs; had he possessed financial means he would not have needed them.

▮ In adopting Dr. Friedman's conclusion as the basis of decision, the board declared that "for an injury to arise out of and occur in the course of employment, the employment itself must be a positive factor influencing the course of disease." (Citing *California etc. Exchange* v. *Industrial Acc. Com.*

[1] It is true that the opinion after reconsideration recites in passing that "the Appeals Board has studied the entire record herein"; but that recital is connected in context only with the board's preliminary determination that Dr. Friedman's report was admissible. A fair reading of the entire opinion makes it clear that the result was exclusively based upon Dr. Friedman's conclusion that the employment was not a "legitimate" cause of hastening Bingham's death.

(1946) 76 Cal.App.2d 836 [174 P.2d 680].) But that is not to say that the conditions of employment need be specially hazardous. It is sufficient that the injury be ''proximately caused by the employment'' (Lab. Code, § 3600, subd. (c)) without regard to whether some other factor such as financial necessity or the personality of the employee operates as a previous link in a chain of causation. (*Lumbermen's Mut. Cas. Co.* v. *Industrial Acc. Com.* (1946) 29 Cal.2d 492, 496 [175 P.2d 832].) It would not be a defense to a compensation claim made by a workman injured in the more usual type of industrial accident to show that he would not have been present at the job site in order to be injured were it not for financial or other personal motivations that caused him to accept employment. Similarly, it is not a defense that Bingham's striving personality caused him to continue to perform two demanding and stressful jobs the performance of which, according to the clear implication of Dr. Friedman's report, hastened his death.

█    Where the appeals board's findings have applied an incorrect test of causation the substantial evidence rule does not prevent review and annulment of the award. (*Hawaiian Pineapple Co.* v. *Industrial Acc. Com.* (1953) 40 Cal.2d 656, 664 [255 P.2d 431].) But we have already seen that the evidence as to causation was in conflict; it is therefor not within our powers to substitute our judgment as to an appropriate ultimate disposition for that of the appeals board.

The award is annulled, with directions to take further proceedings not inconsistent with the views expressed herein.

Devine, P. J., and Rattigan, J., concurred.