[Civ. No. 20509. Third Dist. Apr. 29, 1982.]

ALBERTSON'S, INC., Petitioner, v.
WORKERS' COMPENSATION APPEALS BOARD and JUDITH
BRADLEY, Respondents.

**COUNSEL**

Hanna, Brophy, MacLean, McAleer & Jensen and Douglass F. Penney for Petitioner.

Thomas L. Plumb for Respondents.

## OPINION

BLEASE, J.—We granted a writ of review in this case to consider whether an employee's claim of a cumulative injury (Lab. Code, § 3208.1) to her psyche may be founded upon an honest misperception of job harassment which interacts with a preexisting psychiatric condition so as to cause job stress. We conclude that it may, but agree with the Workers' Compensation Appeals Board (board), which declines to compensate spurious claims of industrial causation (the product of "after the fact rationalization") or claims in which "the employment was a mere passive element that a nonindustrial condition happened to have focused on."

### FACTS

Applicant Judith Bradley began working for petitioner Albertson's, Inc., as a cake decorator in May 1974. She testified that after Bob Bassinger became the manager of the bakery department in late 1978, the number of hours she was scheduled to work began to be reduced from the 40 hours per week she had always worked until then. In some weeks she was scheduled to work between 20 and 32 hours; the total number of hours worked by the bakery staff was determined by sales. In January 1977, she filed a grievance with her union concerning the reduction.

On January 27, she was laid off, despite her protests that she had seniority over another employee who had worked a longer time for Albertson's but had only recently been hired at the store in which Bradley was employed. The layoff subjected Bradley to "[t]errible" financial hardship, severe enough to cause her and her husband to consult an attorney about filing for bankruptcy. After about 10 days, however, she was recalled, and the other cake decorator was laid off, the store conceding she did have seniority after all.

When she returned to work, Bassinger's attitude toward her appeared to have changed; he was now "very curt with [her]." In the days that followed, she overheard Bassinger ridiculing her and talking about "getting rid" of her with one coworker, and two other coworkers informed her that they too had overheard Bassinger expressing an intention to

"get rid" of her. On April 7, 1979, one day after mentioning that he "guess[ed] [they were] going to go to court" on her grievance, Bassinger issued her a written warning for leaving some cakes out of the freezer. Bradley felt the warning was unfair because the merchandise was not damaged and was sold.

Bradley's last day at work was August 21, 1979. She was scheduled to work five hours, but Bassinger told her he wanted her to work eight. When she told him she had an appointment to see a doctor, he became angry and replied, in the presence of a coworker, "'[y]ou better get your butt in high gear because there's nothing here to sell.'" Bradley was "so embarrassed that [she] just wanted to die," and she rapidly began to experience difficulty breathing, shaking and nausea. She told Bassinger she was sick and wished to see her doctor; he responded, in a "very nasty" tone, "'[w]hatever suits you.'" She proceeded to the store manager's office and found Bassinger there, along with other people. She advised the manager that she was going to see a doctor and, in response to his question, she told him Bassinger "had made [her] sick." Her doctor gave her a tranquilizer and kept her at his office for four or five hours after this incident.

Three days later, on August 24, 1979, Bradley received a telephone call from her supervisor in her parttime crystal party business, indicating that Bassinger's wife had inquired whether Bradley was giving any parties during the period she was ostensibly out sick. Receipt of this intelligence prompted an anxiety attack for which Bradley was hospitalized for a week, as well as marking the onset of severe stuttering, which condition persisted at the time of the workers' compensation hearing.

Neither Bassinger nor the store manager, nor the employee with whom he had spoken (according to Bradley, about "getting rid" of her) remembered any such conversation. The store manager and two of Bradley's coworkers (one had since left the store) also corroborated Bassinger's testimony that he did not discriminate scheduling the hours of employees, which were determined by a combination of need (weekend business is far heavier than weekday) and seniority. They also agreed that he was courteous to subordinates and not overly critical. Bassinger and the store manager acknowledged that the 10-day layoff of Bradley was improper, but explained that, when the low volume of business required the store to lay off one of its two cake decorators, the company's industrial relations department was contacted, which erroneously advised them that Bradley's coworker, who had been an employee

of Albertson's, Inc., for a longer period of time, had seniority. The store officials learned later that Bradley had seniority under the collective bargaining agreement because she had been at that store longer. Bassinger explained that it was company policy to issue a written warning to an employee if he or she made a similar mistake after once being warned orally; Bradley received a written warning for leaving cakes outside the freezer because she had done the same thing two days before. He admitted telling Bradley, on the day she left work in hysterics, to "get the lead out," because there was a great deal of work to be done and her medical appointment precluded her working eight hours as he had suggested.

The medical evidence showed that Bradley "had a long history of serious life difficulties including marriage to a brutal [first] husband, following an adolescence traumatized by her parents' divorce." Albertson's psychiatric expert, Dr. Alfred P. French, suggested in his report that Bradley's symptoms (stuttering, periods of depression and excessive sleep, headaches, neck and back spasms, difficulty breathing, intermittent shaking, bruxism, agitation and hyperirritability, impaired concentration and phobic fears of crowds and situations reminding her of her work) might "simply be part of an ongoing, progressive deterioration going back many years and [might] have little or nothing to do with work." Bradley's treating psychiatrist, Dr. Robert B. Cahan, on the other hand, acknowledged in his report that she "had a mild obsessive-compulsive personality" which "[might] well have hypersensitized her to the stressful experiences at work and even colored her perception of those experiences," but he thought her work history was not consistent with the sort of progressive deterioration, independent of work, suggested by Dr. French.[1] There was no disagreement that Bradley was presently incapacitated by her condition.

After listening to the testimony at the hearing, Dr. French was called to testify whether he had formed an opinion as to whether job harassment had actually occurred. He concluded that it had not but, in response to a question by the workers' compensation judge, *he also stated that he did not "have any doubt ... that she subjectively perceived job harassment," and that this "subjective perception [was]*

---

[1]In fact, in his report, Dr. French expressed no doubt that Bradley had "experienced substantial stress." He merely was not certain that she "ha[d], in fact, been subjected to unusual work-related stresses" (see discussion, *infra*) and considered his "alternative explanation" equally plausible.

*related to the psychiatric difficulties [she was] currently experiencing.*" (Italics added.)

The worker's compensation judge found that Bradley did sustain cumulative injury to her psyche, resulting in total temporary disability continuing to the time the finding and award were issued (deferring resolution of issues of permanent disability and apportionment until her condition became stationary), expressly referring, in his opinion, to the foregoing testimony.[2]

The board subsequently denied reconsideration. It said: "[W]e do not inten[d] to suggest that it would be sufficient for purposes of finding industrial causation if the employment were an after the fact rationalization. Nor do we suggest what the result would be had the evidence established that the employment was a mere passive element that a nonindustrial condition happened to have focused on. In this case however, there was ample evidence supporting the judge's conclusion that the employment played an active role in the development of the psychological condition."

## DISCUSSION

There are no published California appellate court opinions addressing the question whether actual, or merely perceived, job harassment must be shown to establish the requisite causal connection between an employee's work environment and resulting psychiatric injuries. We analyze the issue by analogy to cases of job stress.

Job harassment may be thought of as a species of potentially stressful circumstances, like a repetitive job, or an abundance of deadlines. The amount of stress exerted by such circumstances varies from individual to individual; what is stressful to one is not to another. (*Los Angeles Unified School Dist.* v. *Workers' Comp. Appeals Bd.* (1981) 116 Cal. App.3d 393, 401 [171 Cal.Rptr. 841].) "'. . . In order to find a physical industrial injury, a single identifiable traumatic experience need not be shown. (*Fireman's Fund Indem. Co.* v. *Ind. Acc. Com.*, 39 Cal.2d 831,

---

[2]"[E]ven [Albertson's] own examining psychiatrist agreed that notwithstanding an objective determination of job harassment that the applicant did, in fact, subjectively perceive job harassment and that such perception is causally related to and responsible for her present psychiatric condition.

"Accordingly, applicant's claim of industrial injury herein is supported both factually and medically and therefore results in a finding of injury arising out of and occurring in the course of her employment."

834 [250 P.2d 148]; *Lumbermen's Mut. Cas. Co. v. Ind. Acc. Com.*, 29 Cal.2d 492, 496 [175 P.2d 823]; *Argonaut Ins. Co. v. Industrial Acc. Com.*, 231 Cal.App.2d 111, 116 [41 Cal.Rptr. 628].) The disabling injury may be the result of the cumulative effect of each day's stresses and strains. (*Fireman's Fund. Indem. Co. v. Ind. Acc. Com., supra,* 39 Cal.2d 831, 834.) We perceive no logical basis for a different requirement for a psychoneurotic injury. To one experiencing it, such an injury is as real and disabling as a physical injury.' (Fns. omitted.) (*Baker v. Workmen's Comp. Appeals Bd.* [1971] 18 Cal.App.3d 852, 861-862 [96 Cal.Rptr. 279].)" (*Callahan v. Workers' Comp. Appeals Bd.* (1978) 85 Cal.App.3d 621, 628, fn. 3 [149 Cal.Rptr. 647].)

Because "'[i]ndustry takes the employee as it finds him'" (*Lamb v. Workmen's Comp. Appeals Bd.* (1974) 11 Cal.3d 274, 282 [113 Cal.Rptr. 162, 520 P.2d 978], quoting *Liberty Mut. Ins. Co. v. Ind. Acc. Com.* (1946) 73 Cal.App.2d 555, 559 [166 P.2d 908]), a subjective test (that is, one personal to the applicant) has been applied in California to injuries resulting from stress. "[I]t is not the Board's assessment of the amount of stress *inherent* in a workman's employment which governs in matters of stress-caused injury, but rather the Board's determination of the amount of stress which the particular employment has *in fact* exerted upon the particular workman." (Fn. omitted.) (*Lamb, supra,* 11 Cal.3d at pp. 282-283.) The proper focus of inquiry, then, is not on how much stress *should* be felt by an employee in his work environment, based on a "normal" reaction to it, but how much stress *is* felt by an individual worker reacting uniquely to the work environment. His perception of the circumstances (e.g., *crowded* deadlines, *mountains* of paper, a *too-fast* assembly line) is what ultimately determines the amount of stress he feels.

This point was made by the Michigan Supreme Court in *Deziel v. Difco Laboratories, Inc.* (1978) 403 Mich. 1 [268 N.W.2d 1, 97 A.L.R.3d 121], which adopted a subjective standard crediting claimants' honest perception in a scholarly and far reaching opinion: "[*A*]*ll* people manufacture their own concepts of reality. [¶] 'Normal' persons are those who manufacture a reality which most closely parallels that which the vast majority of 'average' people encounter. Psychoneurotics and psychotics fail to manufacture or encounter the same reality because their reactions and adjustment mechanisms either distort, warp or completely fail. [¶] However, their distorted concept of reality is just as 'real' for them as the average person's concept of reality is for him. This is the critical insight. [¶] Once it is determined that (1) a psychoneurot-

ic or psychotic is disabled and (2) a personal injury is established, it is only logical that we employ a *subjective* standard in determining whether the claimant's employment combined with some internal weakness or disease to produce the disability. A subjective standard acknowledges that the claimant is 'mis-manufacturing' or misperceiving reality, otherwise the person would not be a psychoneurotic or psychotic by definition." (*Id.*, at pp. 12-13.)

In *Deziel*, the Michigan court adopted a "'strictly *subjective* causal nexus' standard" under which "a claimant is entitled to compensation [for mental injuries] if it is factually established that claimant *honestly perceives* some personal injury incurred during the ordinary work of his employment 'caused' his disability.... [¶] The focal point of this standard is the plaintiff's *own* perception of reality." (*Id.*, at p. 11.) The board's limiting language in this case, that the claimed causal relationship between employment and injury not be a mere "after-the-fact rationalization," is equivalent to Michigan's "honest perception" rule. Its reservation of the question whether a psychiatric injury is compensable where the "employment was a mere passive element that a nonindustrial condition happened to have focused on" is a point of departure from the *Deziel* rule, which found industrial causation for a psychiatric disability where the applicant's job merely "*perform[ed] the function of a convenient hook on which he can attach causation for troubles of all kinds and once this is set up, this traumatic event becomes the assigned cause by the patient.*" (*Deziel* v. *Difco, supra,* 268 N.W.2d at p. 18.)

■ The limitation by the board finds support in a feature of California's workers' compensation law. Labor Code section 3600 requires not only that an injury "aris[e] out of and [occur] in the course of the employment," it also requires that the injury be "proximately caused by the employment, either with or without negligence." (Lab. Code, § 3600, subd. (c).)[3] "While Labor Code section 3600 requires that an in-

---

[3]Labor Code section 3600 provides: "Liability for the compensation provided by this division, in lieu of any other liability whatsoever to any person except as provided in Section 3706, shall, without regard to negligence, exist against an employer for any injury sustained by his employees arising out of and in the course of the employment and for the death of any employee if the injury proximately causes death, in those cases where the following conditions of compensation concur:

"(a) Where, at the time of the injury, both the employer and the employee are subject to the compensation provisions of this division.

"(b) Where, at the time of the injury, the employee is performing service growing

jury be 'proximately caused' by the employment, this term has received a much broader construction in workmen's compensation law than it has in tort law. All that is required is that the employment be one of the contributing causes without which the injury would not have occurred. (*Madin* v. *Industrial Acc. Com.*, 46 Cal.2d 90 [292 P.2d 892].) Warren L. Hanna observes: 'Thus our courts, in the name of liberal interpretation and the modern trend, have evinced a willingness, in fact, a determination, to accept almost any incidental, indirect, or merely contributing relationship or connection as a substitute for the "proximate cause" required by the compensation law.' (2 Hanna, California Law of Employee Injuries and Workmen's Compensation (2d Ed. (1969), § 8.03.)" (*Wickham* v. *North American Rockwell Corp.* (1970) 8 Cal. App.3d 467, 473 [87 Cal.Rptr.. 563]; see also *Wiseman* v. *Industrial Acc. Com.* (1956) 46 Cal.2d 570, 573 [297 P.2d 649].)[4]

Nevertheless, the statutory requirement retains sufficient force that compensation may not be awarded where the nature of the employee's duties "merely provided a stage for the event." (*Transactron, Inc.* v. *Workers' Comp. Appeals Bd.* (1977) 68 Cal.App.3d 233, 238 [137 Cal.Rptr. 142].) The board's reservation comports with the still persisting California requirement that "'the employment itself must be a positive factor influencing the course of disease.' [Citation.]" (*Bingham*

---

out of and incidental to his employment and is acting within the course of his employment.

"(c) Where the injury is proximately caused by the employment, either with or without negligence.

"(d) Where the injury is not caused by the intoxication of the injured employee.

"(e) Where the injury is not intentionally self-inflicted.

"(f) Where the employee has not willfully and deliberately caused his own death.

"(g) Where the injury does not arise out of an altercation in which the injured employee is the initial physical aggressor.

"(h) Where the injury does not arise out of voluntary participation in any off-duty recreational, social, or athletic activity not constituting part of the employee's work-related duties, except where such activities are a reasonable expectancy of, or are expressly or impliedly required by, the employment. The administrative director shall promulgate reasonable rules and regulations requiring employers to post and keep posted in a conspicuous place or places a notice advising employees of the provisions of this subdivision. Failure of the employer to post such a notice shall not constitute an expression of intent to waive the provisions of this subdivision." (Amended by Stats. 1978, ch. 1303, § 5, p. 4262.)

[4]The criticism may stem from a confusion over the separate statutory roles to be accorded the "arising out of" and "proximate cause" requirements. The requirement that the compensable injury be "sustained by ... employees arising out of and in the course of the employment" serves to establish the relationship of the events, upon which coverage is predicated, to the employment. Proximate cause, on the other hand, provides the measure for the causal link between the events and the injury.

v. *Workmen's Comp. App. Bd.* (1968) 261 Cal.App.2d 842, 848 [68 Cal.Rptr. 410].) ■ The board's determination that Bradley's "employment played an active role in the development of the psychological condition" is supported by substantial evidence. The record shows that a series of conflicts arose between Bradley and her supervisor relating to her scheduled hours and her temporary layoff, which caused her tremendous distress.

The decision of the board is affirmed.

Evans, Acting P. J., and Sparks, J., concurred.