**Ralph O. NEWMAN, Appellant,**

v.

**JOHN DEERE OTTUMWA WORKS OF DEERE & COMPANY, Appellee.**

No. 84–967.

Supreme Court of Iowa.

July 31, 1985.

Rehearing Denied Sept. 19, 1985.

Dennis L. Hanssen of Hopkins & Huebner, P.C., Des Moines, for appellant.

Walter F. Johnson of Johnson, Bauerle, Hester & Walter, Ottumwa, for appellee.

HARRIS, Justice.

We affirm a ruling by which the district court, sitting in review of agency action, overturned the allowance of a worker's compensation claim. We agree with the district court's determination that Iowa's worker compensation statutes provide no benefits on these facts.

Ralph O. Newman went to work for John Deere as a full-time welder in November 1978. On a pre-employment medical questionnaire he stated he never had received treatment for any mental disorder or allergies. This claim was a good deal less than candid, however, because Newman had an extensive medical history of both. He had been diagnosed as manic depressive and had displayed signs of hypochondriasis. One doctor believed he suffered from a hyperventilation syndrome caused by stress or tension. These problems were diagnosed as early as 1972 and Newman intermittently received treatment for them all. He also suffered from many allergies. With these maladies, or perhaps because of them, he developed a single-minded preoc- cupation with fresh air and an aversion to smells.

The case is difficult because on two critical points vital facts are elusive. The claimed accident is something of a phantom and Newman's injuries are without objective physical symptoms.

According to his own testimony, on March 1, 1979, Newman was welding with his face close to the welding rod. He says there was a small explosion and that he experienced a scalding sensation in his throat. Deere introduced evidence indicating the explosion he described was physically impossible.

Newman left the area but continued to work for the rest of the shift. Returning the next day he continued working as a welder throughout all of March and April. It was not until May 5, 1979, two months after the supposed welding accident, that he was seen by Dr. Thomas R. Wolf who diagnosed acute bronchitis due to industrial asthma. Newman was no stranger to Dr. Wolf. Dr. Wolf is a family practitioner with a specialty in allergies. He had been treating Newman since October 1966 for sore throats, colds, fevers, and coughs. The record indicates that no tests are administered to diagnose industrial asthma.

Newman testified that, notwithstanding his failure to promptly seek medical help, his throat would become sore when he welded, with the condition becoming more aggravated during the week but clearing over the weekends. He tried to work the night of May 5, following his visit with Dr. Wolf, but did not finish his shift due, he said, to pain in his throat while he welded.

On May 12 Dr. Wolf issued a note stating:

Mr. Newman has industrial asthma caused by welding fumes. He must be removed from these fumes or areas of high industrial gases. A relocation to a different area in the plant with lower levels of industrial fumes is necessary.

Dr. Herrick, a physician working part-time for John Deere, examined Newman and stated he would not have issued the restric-

tion Dr. Wolf requested, but followed it as a matter of policy anyway, suggesting it last until Newman could be examined by a specialist for pulmonary disfunction. Dr. Herrick found no evidence of an asthmatic condition either then or later.

Pursuant to a release issued by Dr. Wolf, Newman was assigned to an assembly line post where belts were installed on balers. On this line recently painted balers were tested after the belts had been installed. There was welding being performed as close as 25 feet away. Newman complained of mouth and throat sores and a burning chest all due, he thought, to inhalation of paint and diesel and welding fumes. Newman went to the first-aid station on June 1 and June 4. Dr. Herrick issued a permit restricting Newman from working around welding, dust, or fumes.

On June 4, Newman was assigned to a pool of disabled workers and, after convincing a supervisor that he could tolerate dust despite Dr. Herrick's restrictions, was assigned to a sheet steel shed.

Newman was seen by internal medicine specialists, an eye, ear, nose, and throat specialist, a psychiatrist, and a psychologist. None found any tangible physical abnormality; in fact all believed Newman enjoyed good physical health. They nevertheless agreed that, because of what the psychiatrist described as Newman's "unshakeable belief his problem is physical," Newman should stay away from fumes.

On July 20 Newman resumed work. He missed work on August 15 and thereafter refused to return and was fired. He later worked briefly for another employer hauling dry fertilizers but quit due to what he perceived to be an unhealthy exposure to various fumes.

The problems Newman encountered at John Deere conform with a previously set pattern. A psychiatrist at University Hospitals in Iowa City thought Newman's medical history:

> [was] remarkable for a number of allergies as a child which caused hives and skin rash. He [Newman] said he was tested and positive for nearly everything.

These allergies abated with age and currently [December 19, 1976] he is only allergic to cigarette smoke, hog dust, and corn dust.

Prior to working at John Deere, Newman farmed. He also ran a shop on the farm, working there 30–35 hours per week. Until 1976, he had no difficulty working in his shop but was preoccupied with air purity. Newman testified:

> I might state my shop's air condition. I can change air in there four times a minute ... I did have a humidity problem in my shop is really the reason I put it in there. My floor drew moisture just terrible. But as for welding in my shop ... it was just my policy I just do not weld in a building where you get material around that can catch on fire. It's just not even good sense. I usually welded outside.

Newman thought the emotional trauma he suffered from 1972 to 1976 resulted mainly from his frequent confrontation with neighbors. In 1976 he accidentally ran over a neighbor's mailbox. Criminal charges resulted. They were later dropped and Newman then sued his neighbor alleging malicious criminal prosecution and intentional infliction of emotional harm. In the present proceeding he testified his mental condition caused him to sell his livestock in 1976.

In 1973 Newman was hospitalized for ulcers. A few months later he began to have a ringing in his ears which he described as something like a freight train going from one ear to the other. His complex history also included numbness in hands and feet as well as chills for which he often stayed in the bathtub for ten to twelve hours.

The psychiatrist also mentioned in Newman's history that he, Newman,

> described an infection he had some time ago which 'came up out of my lungs, went into my jaws and made my teeth loose.' Much though not all of his hypochondriacal preoccupation centers on his upper respiratory system. His apparent inability to leave the subject matter of

what he terms as "welding fume" induced upper respiratory problem reveals a frank over determined idea in this area.

In view of the number and variety of unsubstantiated physical discomforts complained of it is not surprising that the commissioner rejected Newman's claim to have suffered any physical injury.

The commissioner's finding on Newman's claim of psychological injury is rather more equivocal. The commissioner found that Newman's pre-existing psychological condition was materially aggravated by the March 1, 1979, inhalation of fumes while doing piece work welding. The finding fell conspicuously short of finding that there was any explosion or any other thing out of ordinary about the fumes at the time. The commissioner held:

Simply put, claimant was able to work as a welder and farmer prior to the March 1979 incident. And subsequent to that incident he sees himself as unable to work. [Two doctors] believe that claimant's psychological impairment concerning his ability to work is permanent, and found no indications of malingering or profit motives. For the foregoing reasons it is held that the *alleged* scalding to his throat which claimant received on March 1, 1979, *whether it be real or merely imaginary*, was the proximate cause of the disability upon which he now bases his claim.

(Emphasis added.)

On these facts the commissioner held Newman had established a sixty percent permanent industrial disability. John Deere was ordered to pay his medical expenses and 300 weeks of permanent partial disability. On review the district court determined:

A reasonable mind would not accept the evidence in this record as adequate to reach the conclusion that an alleged explosion incident occurred on March 1, 1979, or that there is a direct causal connection between [Newman's] employment and his psychological condition existing after March 1, 1979.

.    .    .    .    .

This court does not believe that [Newman's] belief, no matter how sincere, is adequate to show a causal relationship between his mental condition and his employment at Deere.

.    .    .    .    .

An imaginary event cannot be a proximate cause of an injury.

Thus, the commissioner did not decide whether there was any explosion, or even whether the inhalation of fumes that day was anything other than routine. Under the commissioner's view it made no difference. The commissioner thought it was enough that welding fumes were inhaled at the time, and this aggravated Newman's complicated preexisting psychological condition. The trial court thought otherwise and accordingly set aside the allowance of benefits.

I. This is a case of first impression in Iowa but courts elsewhere have been presented with it:

The largest volume of recent legislation on the meaning of "injury" has involved various mental and nervous conditions which, as the tangible effects of mental states on physical functions are better understood, have come to play a large part in modern concepts of disability.

The cases may be thought of, for convenience, in three groups: mental stimulus causing physical injury; physical trauma causing nervous injury; and mental stimulus causing nervous injury.

Larson, *Law of Workers' Compensation*, § 42.20 at 7–784.

We need not decide whether any such claim is allowable under the Iowa statute because we find no record support for allowing Newman's claim under any of the three groups of cases last mentioned by Professor Larson. As to the first and third groups, there was no evidence of any work-related mental stimulus. There was no fright or shock. And no job stress, even subjective in nature, is even claimed.

We are then left only with Larson's second group of cases: physical trauma caus-

ing nervous injury. If the physical trauma was imaginary it can form no basis for recovery because, on this record, it was a product of Newman's mental condition and not his work.

We find no cases which permit recovery when employment merely provided a *stage* for the nervous injury. *See Albertson's Inc. v. Workers' Compensation Appeals Board of California,* 131 Cal.App.3d 308, 316, 182 Cal.Rptr. 304, 309 (1982).[1]

Newman's showing rose no higher than evidence of *imagined* physical trauma—the alleged scalding of his throat. Under the circumstances we think this did not amount to substantial evidence of physical trauma. A number of factors combine to lead us to this conclusion: Newman's preexisting mental condition; strong evidence that the explosion he claims—and that nobody else saw—was physically impossible; and the absence of any objective sign of trauma.

We neither accept nor reject any of the three *Larson* categories of nervous condition cases. (Neither do we accept the commissioner's conclusion that imaginary trauma can be the proximate cause of a compensable injury.) Newman's showing will not support a recovery under any recognized theory.

The trial court was correct in reversing the commissioner's decision.

AFFIRMED.

---

1. Other courts reject or greatly restrict the recovery allowed in *Albertson's. See Walck v. Johns-Manville Prods. Corp.,* 56 N.J. 533, 557, 267 A.2d 508, 521 (1970) (mental stress which can be traced to the nature of the employee cannot be considered a risk arising from employer's work, else employer would become insurer); *Szymanski v. Halle's Dep't Store,* 63 Ohio St.2d 195, 198, 407 N.E.2d 502, 505 (1980) ("disabilities ... which are caused solely by emotional stress without contemporaneous physical injury or physical trauma are not compensable...."); *School Dist. No. 1 v. Dep't of Industry, Labor, & Human Relations,* 62 Wis.2d 370, 377, 215 N.W.2d 373, 377 (1974) (non-traumatic mental injury "must result from a situation of greater dimensions than the day-to-day emotional strain and tension which all employees must experience.") Larson prefers the Wisconsin test. § 42.23(b) at 7–639.